Philip I. PALMER, Jr., as Trustee in Bankruptcy of Blue Bonnet Discount Stamp Co., Inc., aka Blue Bonnet Stamp Company, Inc., and B & B Stamp Company, Inc., bankrupt, Plaintiff,

v.

Roy C. STOKELY, Neta K. Stokely, and Stokely Investment Company, a corporation, Defendants.

Civ. No. 64–101.

United States District Court
W. D. Oklahoma.

June 24, 1966.

Norman E. Reynolds, Jr., Oklahoma City, Okl., and James R. Alexander, Dallas, Tex., for plaintiff.

Paul L. Washington, Oklahoma City, Okl., for defendants Stokely.

## MEMORANDUM OPINION

DAUGHERTY, District Judge.

In this case the plaintiff as the duly qualified Trustee in Bankruptcy of Blue Bonnet Discount Stamp Co., Inc., in the United States District Court for the Northern District of Texas, seeks recovery against the defendants Roy C. Stokely, Loneta K. Stokely, and Stokely Investment Company, Inc., under the provisions of Sections 67d(2) and 70e of the Bankruptcy Act.

On April 28, 1960, the defendant, Roy C. Stokely, entered into a contract with A. L., Retha and W. R. Murrell, who were the sole stockholders of Blue Bonnet Discount Stamp Co., Inc., a Texas corporation, (hereinafter called Blue Bonnet or Bankrupt) to purchase all of Blue Bonnet's corporate stock.

This contract was immediately assigned by Stokely to the Stokely Investment Company (hereinafter called Stokely Investment) a corporation wholly owned by Stokely and the co-defendant,

Loneta K. Stokely, his wife, except for two qualifying shares in her parents name. Stokely executed this assignment agreement for both himself and Stokely Investment. Shortly thereafter, by a document dated April 30, 1960, Stokely Investment transferred "all the capital stock of Blue Bonnet" to Southwest Premium Company (hereafter called Southwest) in exchange for the entire common stock of Southwest. Southwest did not receive its corporate charter for another five days. Again, Stokely signed for both parties. The capital stock of Southwest was $1,000.00 for which no money was actually paid in.

Whereas the sale of all of the Blue Bonnet corporate stock from the Murrells to Stokely was for a consideration of $102,517.25, by these documents this same corporate stock was immediately transferred to a wholly owned subsidiary of a wholly owned corporation, which subsidiary had an issued capital of only $1,000.00 for which nothing was actually paid.

Various assets of Blue Bonnet, including $40,231.23 in cash, a note receivable and a Pontiac, were transferred by Stokely direct to the Murrells for a total of Blue Bonnet assets being transferred to the Murrells in connection with their sale of all of the Blue Bonnet corporate stock in the sum of $53,745.86, which was thereafter treated by the Stokelys as an account receivable of Blue Bonnet and an account payable of Southwest.

The Stokelys owned another wholly owned corporation, Prudential Premium Company of Oklahoma, Inc., (hereafter called Prudential) which became involved in various transactions with Blue Bonnet and which was engaged in the same business as Blue Bonnet.

The Stokelys were obviously counseled and guided in their operations by their auditor, Darrell Kirby, who audited the various Stokely corporations, and prepared their tax returns and financial statements. Unfortunately neither Kirby nor the Stokelys could keep the various transactions between the different entities in order. Considerable confusion

of entities in various transactions was noted.

Also either Kirby made the mistake of spelling out the Stokelys' intent for them or the Stokelys made the mistake of allowing a copy of the financial statement of Southwest to fall into the hands of the Trustee in Bankruptcy. In any event this statement succinctly outlined the scheme under the heading "Explanatory Comments" as follows:

"Southwest Premium Company was organized in Texas on May 4, 1960 with authorized common stock of $1,000.00 * * *.

"The company was organized mainly to acquire all of the stock of Blue Bonnet Discount Stamp Company. When this stock was purchased, it was desired to pay for it out of the assets of Blue Bonnet Discount Stamp Company. * * *

"The net result will be that the owners of the stock will have no money invested in the company and that all payments to the Murrell's will be made from the assets of Blue Bonnet Discount Stamp Company. This will result in effect in a partial liquidation of the company and the same result could have been achieved at the date of purchase except that any income tax benefit to be derived from the net operating loss carry forward would have been lost.

"Blue Bonnet Discount Stamp Company is a wholly owned subsidiary of Southwest Premium Company. Your ownership of the two companies is represented by the 1000 shares of stock of Southwest Premium Company."

The evidence disclosed that the inventory of Blue Bonnet was reduced approximately $115,000.00 within one year after the Murrells sold to Stokely and during the same period the cash was reduced over $60,000.00. There was also a reduction in the equipment and furniture.

$17,000.00 was transferred from Blue Bonnet to Prudential on August 8, 1960, which, it was subsequently stipulated and agreed, was a payment on new catalogs. $10,000.00 was then transferred from Blue Bonnet to Stokely Investment on November 16, 1960, $5,000.00 to the same company on March 24, 1961 and $2,000.00 to the same company on April 21, 1961. The books and records of Blue Bonnet reflected these as additions to its accounts receivable bringing the total thereof to $70,745.86 but subsequently this money was applied to the purchase price of premium catalogs which were acquired by Blue Bonnet in conjunction with Prudential and which were identical with the Prudential catalog except for the cover. The catalogs were said to have been acquired jointly so as to reduce the per unit cost.

About January 31, 1961, Stokely Investment, which owned Southwest, entered into an agreement with Andrew J. Douds, manager of Blue Bonnet, to transfer Southwest (which owned Blue Bonnet) to him for which the principal consideration was Douds' assumption of the balance then due to the Murrells of $45,000.00 on their sale of Blue Bonnet to Stokely. Nothing was paid on this obligation by Douds and he was released from the transfer by an instrument dated August 22, 1961.

For several months prior to the release of August 22, 1961, Douds and Stokely both participated in efforts to sell Blue Bonnet and finally on August 23, 1961 a contract was made with Howard Hedges to transfer the capital stock of Blue Bonnet to Hedges and the only obligation stated therein was that Blue Bonnet under Hedges' ownership would pay a large existing account payable. This was never fully paid.

Hedges' CPA, Dale Lingren, and Hedges both testified that the company was clearly insolvent at that time even including as an asset an account receivable from Southwest of $70,745.86. Hedges' bookkeeper stated that the business was losing at least $5,000.00 monthly at the time according to her computations. The last financial report of Blue Bonnet dated April 31, 1961, which was prepared by Kirby on May 24, 1961, re-

flected an insolvent condition of $28,-508.00 with the $70,745.86 account receivable from Southwest included as an asset. Blue Bonnet's next prior financial statement as well as its tax returns (all prepared by Kirby) reflected the condition at the end of its fiscal year, October 31, 1960, to show the company solvent by only $13,787.00. This included the Southwest account receivable as of that date of $53,745.86. The evidence, therefore, seems clear that the company became insolvent at least as early as January 1, 1961. It follows that the property remaining in its hands was an unreasonably small capital at a time prior thereto by several months.

At about the time of the sale of Blue Bonnet to Hedges, Stokely and Kirby apparently concluded it was advisable to cancel the account receivable owed Blue Bonnet by Southwest in the amount of $53,745.86 and prepared an agreement ostensibly dated December 21, 1960, cancelling this debt which is signed by Stokely for both Blue Bonnet and Southwest. Plaintiff, however, produced an expert witness on questioned documents, Madge McPherren, who caused magnified pictures to be taken of a portion of this cancellation document which clearly reflects the fact that the document was originally typed to read the 21st day of August, 1961. She further testified that this document was typed at the same time and by the same typewriter that typed the sale agreement dated August 23, 1961, which Stokely and Hedges signed.

The defendants next relied upon corporate minutes ostensibly authorizing the cancellation as of December 6, 1960, but the testimony shows that Hedges requested the corporate minutes but was unable to obtain them for several months after he took over the business and the questioned document expert's testimony again made it clear that said minutes were not prepared at or about the dates reflected therein. The secretary of the corporation, the defendant, Loneta K. Stokely, did not know who typed the corporate minutes, when or where they were typed, the color or size or shape of the corporate minute book, or where it was kept and the evidence is, therefore, rather conclusive that the minutes were prepared after the fact. Regardless of this the mere authorization to an officer contained in the minutes to cancel an obligation does not effect a cancellation of the obligation without more.

Hedges managed to keep the business alive for a short period but it subsequently was declared a bankrupt on a petition filed against it on April 30, 1962, with very substantial obligations outstanding of both merchandise creditors and premium stamp holders.

This case was tried to the Court without a jury. The plaintiff presented his case by way of testimony from the defendants, Roy C. and Loneta K. Stokely, and their CPA, Kirby, and from the depositions and interrogatories of witnesses who were residents of Texas, Maryland and Minnesota. The defendants did not offer any additional witnesses.

Remington on Bankruptcy in its recent supplement to Section 1650.2 states:

"It can be said, generally, that late decisions indicate increasing impatience on the part of courts with respect to 'juggling' of assets between individuals and corporations owned or controlled by them, and between corporations all of which are under the same control, where it seems to be obvious that the process is merely one of skimming the cream into another jar out of reach of creditors. Actual fraud can be found to exist in such instances where it appears, from the entire picture, to have been the motive."

Plaintiff has alleged a violation of Section 67d(2) of the Bankruptcy Act in each of the four subdivisions thereof. Also plaintiff alleges that Section 70e of the Bankruptcy Act makes applicable some eight Texas Corporation Code Statutes. Texas law is applicable since the entire transaction of which plaintiff complains took place in Texas.

This Court has jurisdiction both under the specific grant of jurisdiction contained in Sections 67e and 70e(3) of the Bankruptcy Act as well as the fact that there is a diversity of citizenship between the Trustee and the defendants, and the amount involved, exclusive of interest, exceeds $10,000.00. Defendants were served within this judicial district.

■ Plaintiff contends that the cancellation of the $53,745.86 owed the Bankrupt by Southwest is void under each of the four subsections of Section 67d(2) of the Bankruptcy Act since it occurred within one year prior to bankruptcy, there were Blue Bonnet creditors existing at the time of the cancellation, there were others who subsequently became creditors of Blue Bonnet, Blue Bonnet was insolvent at the time of the cancellation, it was engaged in business for which the property remaining in its hands after the cancellation was an unreasonably small capital, the cancellation was made by the Stokelys in behalf of Blue Bonnet and they believed it would incur debts beyond its ability to pay as the debts mature, and also was made with actual intent to hinder, delay or defraud either existing or future creditors, and particularly the premium stamp holders. The evidence shows that each of these allegations was clearly established by the evidence of the plaintiff.

■ The payment of the debts of another by a corporation while insolvent is not a fair consideration to the corporation. Re B-F Building Corporation, 312 F.2d 691, (6th Cir. 1963); Re College Chemists, Inc., 62 F.2d 1058, (2nd Cir. 1933); Remington on Bankruptcy, Sections 1643.5 and 1650.1; Annotation at 30 A.L.R.2d 1209; Pemberton v. Longmire, 194 Okl. 311, 151 P.2d 410 (1944).

The Court finds that there was no fair consideration to Blue Bonnet on the said debt cancellation or those transactions set forth below as being void under the Bankruptcy Act or otherwise.

■ Further, the plaintiff alleges that Southwest is the alter ego of Stokely Investment and that Stokely Invest-ment and Southwest as well as Prudential are all alter egos of the defendants, Roy C. and Loneta K. Stokely. The evidence showed this to be true in view of the ownerships, control, conduct and actions by all as set out above.

The case of Stone v. Eacho, 127 F.2d 284 (4th Cir. 1942), holds:

" 'It is well settled that courts will not be blinded by corporate forms nor permit them to be used to defeat public convenience, justify wrong or perpetrate fraud, but will look through the forms and behind the corporate entities involved to deal with the situation as justice may require.' * * * (Citing cases)

'Not only is this done for the purpose of holding a stockholder or parent corporation for debts created by an insolvent corporate agent or subsidiary which is a mere instrumentality of the stockholder or parent, but also for the purpose of allowing the creditors of the stockholder or parent to reach assets held by such a subsidiary.' * * * (Citing cases)

'And, where the court decides that the corporate entity of the subsidiary should be completely ignored and its assets and liabilities treated as those of the parent corporation, it is both logical and convenient that this be done in one proceeding.' * * * (Citing cases)"

■ The officers and directors of corporations act in a fiduciary capacity and where a transaction or contract is entered into between corporations having officers or directors in common this circumstance will be considered and the transaction will be jealously regarded by the Courts. Where the transaction would be a great advantage to one corporation at the expense of the other, especially where, in addition to this, the personal interests of the directors, or any of them would be enhanced at the expense of creditors, the transaction is voidable by the Trustee in Bankruptcy. Corsicana National Bank v. Johnson, 251 U.S. 68, 90, 40 S.Ct. 82, 91, 64 L.Ed. 141,

155; Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 41 S.Ct. 209, 212, 65 L.Ed. 425; United Towing Company v. Phillips, 242 F.2d 627 (5th Cir. 1957), Cert. denied, 355 U.S. 861, 78 S.Ct. 93, 2 L.Ed.2d 68, which case arose in Texas; Fish v. East, 114 F.2d 177 (10th Cir. 1940); Chorost v. Grand Rapids Factory Show Rooms, Inc., 172 F.2d 327 (3rd Cir. 1949); and Felty v. National Oil Co. of Texas, Tex.Civ.App., 155 S.W.2d 656 at 658.

The officers and directors of a corporation may not appropriate corporate assets for their own purpose. If they do they are responsible for the wrongful use or diversion of corporate property and are accountable for any profits made therefrom. Since the property of a corporation is a trust fund in the hands of the directors for the benefit of its creditors and stockholders an agreement by the directors by which the corporate property is transferred for their own use and benefit will not be upheld against creditors and stockholders who do not assent thereto. The directors have no authority to use the funds of a corporation to pay their individual indebtedness; the rule that an agent cannot use the property of his principal to pay his own debt applies to all agents and a director of a corporation is no more exempt from this rule than the humblest agent in its service. Milam v. Cooper Co., Tex.Civ.App., 258 S.W.2d 953; 19 Am.Jur.2d, Corporations, page 582, Section 1151.

Those who would support transactions between corporations having officers and directors in common have the burden of showing their fairness. Geddes v. Anaconda Copper Mining Co., supra; Felty v. National Oil Company of Texas, supra; International Bankers Life Insurance Co. v. Holloway, Tex., 368 S.W.2d 567.

A subsidiary corporation is a mere instrumentality of a parent corporation when (1) the parent owns all the stock; (2) both have common directors and officers; (3) the parent finances the subsidiary; (4) the parent causes the subsidiary's incorporation; (5) the subsidiary has grossly inadequate capital; (6) the parent pays salaries or expenses of the subsidiary; (7) the subsidiary has no business except with its parent or subsidiary corporation or no assets except those transferred by its parent or subsidiary; (8) directors and officers do not act independently in the interests of the subsidiary; (9) formal legal requirements of the subsidiary such as keeping corporate minutes are not observed; (10) distinctions between the parent and subsidiary and subsidiary and its subsidiary are disregarded or confused; (11) subsidiaries do not have full board of directors. These tests were outlined by the United States Court of Appeals for the Tenth Circuit in the case of Fish v. East, 114 F.2d 177 at 191. The proof shows that they apply to the situation herein.

There can be no doubt but that the so-called "corporate veil" can and should be pierced under the facts at hand. To not do so would defeat public convenience, justify wrong and protect fraud. Stone v. Eacho, supra; Sampsell v. Imperial Paper & Color Corporation, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293; Fish v. East, supra.

Certainly the burden should be upon the defendants to show the fairness of these transactions and they have failed therein. Geddes v. Anaconda Copper Mining Co., supra; Felty v. National Oil Company of Texas, supra; International Bankers Life Insurance Company v. Holloway, supra. On the other hand the plaintiff showed the unfairness of the transactions which forms the basis of the relief granted plaintiff. In fact there was no consideration to Blue Bonnet in any of the transfers in issue herein except regarding the catalogs and the salary to Murrell.

It is a cardinal principle that a director or officer of a corporation will not be permitted to make a private or secret profit out of his official position; he must give to the corporation the benefit of any advantage which he has there-

by obtained. Milam v. Cooper Co., supra; International Bankers Life Insurance Co. v. Holloway, supra; Dunagan v. Bushey, Tex.Civ.App., 263 S.W.2d 148; 19 Am. Jur.2d, Corporations, Section 1281, page 687.

The Court, therefore, finds and concludes that Southwest, Stokely Investment Company and Prudential were all alter egos of Roy C. Stokely and Loneta K. Stokely at all times involved herein; that the "corporate veil" of each corporation should be and hereby is pierced, their entities ignored and their actions and obligations are in fact and law the actions and obligations of the said Roy C. Stokely and Loneta K. Stokely in so far as all matters herein are concerned.

Since the defendants treated the $53,745.86 obligation as a debt due from Southwest to Blue Bonnet from May 4, 1960 until its cancellation, the Court will accept said treatment and hold that since the cancellation was a nullity, the debt is due and owing by Southwest and as the alter ego of Stokely Investment Company and the Stokelys in turn the debt is, therefore, due and owing by them and each of them together with interest thereon at the rate of 6 percent per annum from May 4, 1960. Since the statute of limitations on the debt had not expired at the commencement of bankruptcy, Section 11e of the Bankruptcy Act became the applicable limitation statute. This action was timely brought by the Trustee. Collier on Bankruptcy, Section 1196.

■ Plaintiff also complains that $34,000.00 of Blue Bonnet money subsequently applied to catalogs exceeded the agreement whereby Blue Bonnet and Prudential were to participate equally in the cost of the catalogs. The evidence reflects that equal treatment was the intent and purpose and was carried out. This contention of the plaintiff and recovery sought therefor is denied.

The evidence reflects that the total charge which the Stokelys attributed to Blue Bonnet for catalogs was $33,950.61 and since $34,000.00 was so applied there

was obviously an overpayment of $49.39. Blue Bonnet was charged for its catalog cover but also was charged one-half of the $2,000.00 cost of the Prudential catalog cover and is entitled to a reimbursement of $1,000.00 therefor. Blue Bonnet was charged for catalogs at a rate of $78.08 a thousand, whereas the cost was $77.00 a thousand, and therefore Blue Bonnet is entitled to a recovery of $147.07. The evidence further shows that there was a credit memo of $1,100.00 extended by the catalog publisher and that Blue Bonnet is entitled to one-half of this. These overpayments regarding the catalog transaction total $1,746.46 and plaintiff is entitled to judgment for said amount against the Stokelys, since Prudential who wrongfully got these benefits was their alter ego as aforesaid, plus interest at the rate of 6 percent per annum from April 21, 1961.

■ The defendants Stokelys on August 23, 1961, retained possession of a boat and motor which belonged to Blue Bonnet at the time of the Hedges acquisition which had a depreciated value of $578.00. This transfer is fraudulent and recoverable under Section 67d(2) of the Bankruptcy Act. Plaintiff is entitled to a judgment for said amount against the Stokelys together with interest thereon at the rate of 6 percent per annum from August 23, 1961.

■ The Stokelys caused a total of $285.87 of Blue Bonnet's money to be improperly applied on auditing expenses and taxes of Southwest Premium. Plaintiff is entitled to a judgment therefor against the Stokely Investment Company and the Stokelys under the alter ego theory as aforesaid together with interest at the rate of 6 percent per annum from July 12, 1961.

■ The Court further finds that one-third of the Kirby audit bill of $900.00, submitted for services rendered at the approximate time the Stokelys purchased Blue Bonnet, represent services performed by him prior to the purchase and which were for the benefit of the defendants and not the Bankrupt. The

plaintiff is, therefore, entitled to recover the sum of $300.00 from the Stokely Investment Company and the Stokelys under the alter ego theory as aforesaid together with interest at the rate of 6 percent per annum from September 9, 1960, the date of payment to Kirby.

Plaintiff seeks recovery of the sum of $6,249.00 which was paid by Blue Bonnet to A. L. Murrell for advisory services after his sale to Stokely. Stokely entered into an agreement with Murrell, dated April 28, 1960, whereby Blue Bonnet employed the said Murrell as a consultant after the Stokely interests took over, at the rate of $5,000.00 per year for three years. Monthly payments totaling $6,249.00 were made to Murrell by Blue Bonnet after the Stokely acquisition and continuing through the Douds "ownership". Such payments were terminated by Hedges upon his acquisition of the business. While the evidence shows that Murrell was around the place of business only a few times after he sold his stock, the plaintiff's contention that the said transaction constituted no more than an additional use of the corporate assets to pay for the corporate stock is not sufficiently proved. Murrell is deceased. The extent of the testimony sustaining plaintiff's contention is that of Murrell's brother who was also a stockholder.

The Court feels that such agreements are often made upon the sale of a business and that the new owners will often seek the advice and the use of the name of the prior owners. Plaintiff's contention on this claim is denied.

Plaintiff finally contends that it is entitled to attorneys fees as in a suit on account, or in the alternative to exemplary damages under the Texas statutes. Plaintiff relies upon 12 Oklahoma Statutes, 1961, Section 936, which provides for attorneys fees to be taxed as costs in actions on open accounts. The Oklahoma Supreme Court has interpreted this statute in the recent decisions of Globe and Republic Insurance Company of America v. Independent Trucking Company, 387 P.2d 644, and Sanditen v. Brooks Flame-Spray, Inc., 403 P.2d 471. These decisions are applicable here. Although the records of the company do reflect the initial account receivable of $53,745.86 and which is recovered herein by the plaintiff, the Court holds that this was not a running open account as interpreted in those decisions, but rather was a contractual obligation to pay.

The Court finds that Blue Bonnet was doomed to fail, that it was exploited by the defendants for their own benefit, and after they had accepted the benefits and used the assets, they tried to cancel the obligation. There can be no question but what the individual defendants were the principals motivating and manipulating the entire operation, although they may have relied on and been guided by their auditor. And the "corporate veils" being pierced they are individually responsible. There is no question but what the company was hopelessly insolvent when they sold it to Hedges without requiring him to make any payment therefor, and that it was only a question of time until the business would fail completely. Their efforts to cleanse themselves by cancelling the debt and selling the company cannot be allowed to go uncorrected by this Court. If such corporate activities are not condemned the entire business climate of this country is in jeopardy.

Plaintiff is, therefore, entitled to judgment against the defendants Stokely Investment Company, Roy C. Stokely and Loneta K. Stokely in the sum of $54,331.73 with interest as heretofore provided and judgment against the defendants Roy C. Stokely and Loneta K. Stokely in the further sum of $2,324.46. Counsel for plaintiff will prepare an appropriate judgment conforming to the foregoing and submit same to the Court for execution and entry. Rule 58, F.R. Civ.P., 28 U.S.C.A.