R. W. SHAW III AND INEZ SHAW, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2175–68. Filed December 11, 1972.

*Sam J. Day* and *Fred A. Sanders*, for the petitioners.
*W. John Howard, Jr.,* and *Bernard Nelson,* for the respondent.

WITHEY, *Judge:* Respondent determined deficiencies in Federal income tax for the joint returns of R. W. Shaw III, hereinafter

petitioner, and Inez Shaw, hereinafter Inez, for the calendar years 1964 and 1965 in the amounts of $16,727 and $26,486.84, respectively. By amended answer, respondent has increased the deficiency for the years 1964 and 1965 to the total amounts of $39,064.94 and $36,663.24, respectively.

Petitioner has not put the disallowance of interest deducted in 1965 into issue; consequently the only remaining issue is the taxability to petitioner of insurance commissions received during the years 1964 and 1965, and petitioner's alternative claim of a deduction to the extent that certain payments represent expenses in the production of the commission income.

FINDINGS OF FACT

Certain facts have been stipulated; the stipulations of fact and the exhibits attached thereto are incorporated herein by reference. Petitioner and Inez, husband and wife, were legal residents of Fort Worth, Tex., at the time the petition was filed; joint Federal income tax returns were filed for the calendar years 1964 and 1965 with the district director of internal revenue, Dallas, Tex.

At various times prior to February 1964, petitioner owned, solely or as controlling shareholder, Grady Helm Motor Co., hereinafter called Grady, Dub Shaw Motor Sales, hereinafter called Motor Sales, and American National Automobile Association, formerly American National Loan Co., and hereinafter called American. American was incorporated in 1956 and was in the automobile loan business. During or before February 1964, Grady, Motor Sales, and American ceased actively carrying on their auto sales and auto loan businesses. American was not liquidated until December 1966.

In February 1964, petitioner acquired from unrelated parties all of the capital stock in Beck-Bolin Ford Sales, Inc., a Texas corporation doing business in Fort Worth, Tex. From its inception in 1961 to the time of petitioner's acquisition in 1964, Beck-Bolin Ford operated at a loss. Following the acquisition petitioner caused the name of the corporation to be changed to Dub Shaw Ford, Inc., and hereafter the corporation will be referred to as Shaw Ford. During the years at issue, petitioner was president of Shaw Ford and Inez Shaw was secretary-treasurer.

On January 16, 1959, petitioner executed a contract, hereinafter called the Lloyds contract, with South Texas Lloyds, hereinafter called Lloyds; an amendment to the Lloyds contract was executed by petitioner on February 7, 1964. The Lloyds contract was addressed to "Mr. R. W. Shaw, III, American National Auto Loan, 810 W. 2nd Street, Fort Worth, Texas." The amendment was addressed to "Mr. R. W. 'Dub' Shaw, Dub Shaw Ford, Incorporated, 605 East

Berry Street, Fort Worth, Texas." The Lloyds contract was a printed form contract and stated in part that Lloyds:

has this day executed and delivered to you a power of attorney, in which you are designated as Attorney-in-Fact for South Texas Lloyds, and such a power of attorney is by reference incorporated herein and made a part hereof for all purposes. * * *

For the services that you are to render under and by virtue of the power of attorney aforesaid, the underwriters at South Texas Lloyds agree to pay you a commission equal to that portion of 80% of the total earned premiums on Automobile Insurance policies written in South Texas Lloyds by you which may remain after paying out of such total earned premiums all claims for losses under all policies written or ordered by you, and all charges and costs of every nature incident to the settlement of all such claims. * * *

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

You shall not be obligated to write any insurance on behalf of the underwriters at South Texas Lloyds, and the said underwriters shall not be obligated to issue any insurance policies upon your orders; but this contract is intended only to prescribe the manner and amounts of payments, to each party hereto by the other on such policies as you may issue or order and South Texas Lloyds may accept.

This agreement cannot be altered or varied by any prior, contemporaneous, or subsequent oral agreement, and attempted oral modification thereof shall be void.

At some time during 1964, petitioner entered into an informal arrangement with the Keystone Agency which was the general agent for Keystone Life Insurance Co., hereinafter referred to as Keystone, whereby personal insurance would be sold to debtors of Shaw Ford. On February 10, 1965, petitioner entered into a formal agreement, hereinafter referred to as the Keystone agreement, with Keystone Agency. The Keystone agreement named petitioner agent and granted "authority to the Agent to solicit credit life, accident, and health insurance on the debtors of Dub Shaw Ford, Inc. [and] The Continental National Bank" and could not be altered or amended except in writing. The Keystone agreement further stated that:

The agent, by accepting the Agreement, hereby agrees to perform all the covenants and conditions by him to be performed hereunder and will faithfully account for and pay to the General Agent the amounts of premium on such policies written by the Agent.

At or before the time of the execution of the Lloyds contract on January 16, 1959, petitioner was individually licensed as an insurance agent under the laws of Texas and has remained licensed throughout the years in question.

From the date of the Lloyds contract through the years in question, all policies of insurance issued by Lloyds or Keystone for which petitioner was used as attorney-in-fact or agent were issued to cus-

tomers of either Grady, Motor Sales, American, or Shaw Ford, and insured either vehicles sold to or obligations entered into by those customers. During the same period, all commission payment checks arising from the sale of insurance pursuant to the Lloyds and Keystone contracts were deposited directly to the account of, and reported as taxable income by, the corporation most directly connected with the sale of the policy, each check first having been endorsed by petitioner or upon his order. Petitioner has consistently believed the respective corporations to be entitled to the amounts represented by such checks for the services rendered in the sale of such insurance policies.

Each of the commission checks received from Lloyds and Keystone was made payable to the order of petitioner or petitioner and Continental National Bank, hereinafter called Continental. (Commission checks payable to the order of both petitioner and Continental were the result of notification to Lloyds or Keystone that the commission income had been assigned or pledged to the bank as collateral for debts entered into by Shaw Ford in the ordinary course of its business as an automobile dealership.) Upon the receipt of the commission check, Continental would hold the check until payment of the secured obligation by Shaw Ford, and thereafter released the check either to petitioner or to an employee of Shaw Ford.

Shaw Ford from its inception was advertised as an auto dealer offering a complete range of services, including sales, service, finance, and insurance. The persons directly involved with the insurance business were all employed by Shaw Ford. They were the floor salesmen, the "closers," and various clerical persons. The floor salesman would suggest to a prospective customer that insurance was available and that the customer discuss insurance with the "closer." The persons entitled "closers" employed by Shaw Ford were not personally licensed to sell insurance but would, in the course of the sale of a vehicle, adjust the vehicle price downward by all or a portion of the commission to be derived from the sale of an insurance policy if the prospective customer expressed an intent to purchase both the vehicle and the insurance. A firm-price quotation regarding the vehicle was not made to the prospective customer by either the floor salesman or the "closer" until the customer had expressed an acceptance or rejection of the vehicle-insurance combination. It was the closer's duty to evaluate the insurance risks connected with each customer and in high-risk situations withhold the offer of insurance. The insurance application forms were prepared by the "closers," with petitioner's name as authorized representative being entered to complete the form by one of several clerical personnel employed by Shaw Ford. The customer purchasing insurance paid the premium to Shaw Ford who forwarded it to either Lloyds or Keystone. Petitioner's spouse, a full-

time employee of Shaw Ford, handled virtually all of the claims against policies. Petitioner was president of Shaw Ford, performed management functions and occasionally performed the function of the "closer" but was paid no salary as compensation for his services in either capacity during the years in question.

As a direct result of the sale of insurance in conjunction with the sale of an auto at a reduced price, a substantial but indefinite number of additional autos were sold. Further results from the sales of insurance, also substantial in nature but indefinite in amount, were an increase in body and repair shopwork, and a reduction in the number of accounts becoming uncollectible due to the death or incapacity of the purchaser, or uninsured damage to the auto.

The costs related to the sale of insurance were borne by Shaw Ford and were not separately accounted for in its bookkeeping or reporting functions. The only direct cost related to the sale of insurance was a commission to the floor salesman involved in the transaction of approximately $20 per policy. The indirect costs included the closers' annual bonuses, based on overall company profits, including profits generated from the sale of insurance, the salaries of clerical employees devoting a portion of their time to the insurance sale and claim adjustment function, and the cost of related supplies, postage, and phone.

During the years in question, the Shaw Ford gross profit and expenses directly attributable to the sale of vehicles and insurance were as follows:

|  | 1964 | 1965 |
|---|---|---|
| Vehicle gross profit | $500, 397 | $610, 967 |
| Insurance gross profit (net commissions received) | 39, 328 | 59, 597 |
| Total gross profit | 539, 725 | 670, 564 |
| Overhead expenses attributable to sale of vehicles and insurance | 395, 353 | 381, 711 |
| Other overhead expenses (donations, interest, depreciation, taxes, etc.) | 108, 567 | 146, 897 |
| Total expenses | 503, 920 | 528, 608 |
| Net income from combined vehicle and insurance sales | 35, 805 | 141, 956 |

The amounts of overhead expenses attributable to both the sale of vehicles and insurance shown above include salemen's commissions for 1964 and 1965 of $70,627 and $82,518, respectively; of those amounts, at least $9,000 and $12,500 for 1964 and 1965, respectively, represented the direct commission paid to salesmen as a result of the sale of insurance.

In addition to the insurance commissions on policies sold by employees of Shaw Ford and deposited in the bank account of Shaw Ford, there were commissions in the amount of $37,865.11 and $17,748.80 received in 1964 and 1965, respectively, and deposited in the bank account of American. These commissions were the result of policies

issued under the auspices of the Lloyds contract but in conjunction with business of American transacted prior to February 1964.

All commission payments received by petitioner from Lloyds during 1964 and 1965 were allocated and deposited either to American or to Shaw Ford. All of the commission payments received by petitioner from Keystone during 1964 and 1965 were allocated and deposited to Shaw Ford.

At petitioner's request, Lloyds made a determination and maintained appropriate records identifying separately those commission payments attributable to business transacted by American and those commission payments attributable to business transacted by Shaw Ford. However, both amounts were combined by Lloyds into a single lump sum for purposes of the annual Form 1099 information return for 1964 and 1965.

The 1099 annual information returns for 1964 and 1965 issued by Keystone were issued to "Dub Shaw, as agent for Dub Shaw Ford, Inc." Lloyds Form 1099 annual information forms for 1961, 1962, and 1963 were addressed to petitioner "as agent for American." For 1964 and 1965, the Form 1099 from both Lloyds and Keystone contained a space calling for the payee's identification number rather than petitioner's social security number. The form of address for the Forms 1099 was determined by Lloyds and Keystone without instruction or request from petitioner.

Respondent's notice of deficiency claimed petitioner received as additional personal income the insurance commissions shown above to have been deposited to the account of Shaw Ford. Respondent has since amended his answer to conform to proofs. The amendment added as contested income the 1964 and 1965 payments deposited to the American account.

The notice of deficiency also included a disallowance of $1,056.39 in interest expense. The petition has put in question the alleged income due to insurance commissions but has not challenged the interest disallowance.

OPINION

This dispute revolves around the legal conclusions to be drawn from the following ultimate facts: Insurance agency contracts were entered into individually by petitioner and payments of commissions were made to his order; the payments were the direct result of efforts of petitioner's corporations rather than petitioner, the sale of insurance being completely integrated into the other business of the corporations; petitioner consistently treated the income as belonging to the corporations, endorsing each commission payment to him to the corporation most directly related to the sale of the individual policies.

It is respondent's view based on section 61 [1] that petitioner "earned" the commission payments of 1964 and 1965 and consequently must be taxed thereon. It is petitioner's view that the commissions were "earned" by the respective corporations and that the corporations are therefore the appropriate taxpayers.

Petitioner sets forth two alternative arguments. First, he claims that the endorsement of commission checks constituted compensation (deductible under section 162) for services rendered by the corporations in the production of the insurance income. Second, petitioner claims that if the entire amount of the endorsed payments is not deductible under section 162, then he should be allowed a deduction under that section at least equal to the direct and indirect expenses incurred by the corporations in the sale of insurance.

In this case, respondent has not attempted to reallocate the commission income under section 482,[2] nor has he challenged the viability of either of petitioner's corporations. Indeed, the viability of Shaw Ford is clear on the record, *Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943); compare *Kimbrell* v. *Commissioner*, 371 F.2d 897 (C.A. 5, 1967), and the viability of American must be assumed since respondent has not challenged it. With regard to commissions attributable to American, respondent has the burden of proof as a result of his amended pleadings.

In reaching his conclusion that the income was earned by petitioner, respondent suggests as clearly controlling the fact that it was petitioner rather than his corporations who entered into the contracts granting agency powers, the fact that Shaw Ford and American would have been acting contra to the language, and/or the intent of State law had they entered directly into such contracts, and the fact that the commission payments were made directly to petitioner. However true respondent's factual allegations are, his argument that such facts preclude any other result as a matter of law misses the point here at issue.

First, with regard to the agency contract and the license, it is possible for a corporation to derive income from the license or contract status of another, even though the corporation might itself be barred from obtaining the contract or license directly. This is true for State law purposes, *James N. Tardy Co.* v. *Tarver*, 120 Tex. 591, 39 S.W. 2d 848 (Tex. Comm. App. 1931), and it is true for Federal tax

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

[2] The Commissioner has the statutory authority under sec. 482 "In any case of two or more organizations, trades, or businesses (whether or not incorporated * * *) owned or controlled directly or indirectly by the same interests * * * [to] distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades or businesses." Sec. 482 entails as a prerequisite a clear and fair notice to the petitioner that such power is invoked.

purposes, at least to the degree a corporation received or could have received the proceeds, *Local Finance Corp.*, 48 T.C. 773 (1967), affd. 407 F.2d 629 (C.A. 7, 1969), certiorari denied 396 U.S. 956 (1969) (corporation derived income from activities of individually licensed insurance agents); *Nat Harrison Associates, Inc.*, 42 T.C. 601 (1964) (subsidiary derived income from contract entered into by parent notwithstanding contractual bar to assignment and notwithstanding lack of formal transfer or assignment from parent to subsidiary); compare *Commissioner* v. *First Security Bank of Utah*, 405 U.S. 394 (1972), affirming a reversal of a Memorandum Opinion of this Court. (See fn. 4 *infra*.)

Respondent's second contention is that since Texas law prohibits a corporation from acting as an insurance agent, this Court should decide as a matter of law that American and Shaw Ford could not be the "earners" of the commission income, thus leaving petitioner as the proper party to be taxed.[3] This Court is not barred from finding that a transaction was carried out in a particular manner simply because such a transaction would violate a State or national law.[4] This is not a case in which State law is used as evidence of the *intended* substance of a transaction.[5] In each of the cases relied upon by respondent with respect to the tax consequences of the illegality of one of two possible forms of a transaction, the respective court decisions were adequately supported by facts in the record independent of State law considerations. *Jaeger Motor Car Co.* v. *Commissioner*, 284 F. 2d 127 (C.A. 7, 1960), affirming a Memorandum Opinion of this Court, certiorari denied 365 U.S. 860 (1961); *Ray Waits Motors* v. *United States*, 145 F. Supp. 269 (E.D.S.C. 1956); and *Blassie* v. *Commissioner*, 394 F. 2d 628 (C.A. 8, 1968), affirming a Memorandum Opinion of this Court.

---

[3] Petitioner does not contest the claim by respondent that the corporations would violate State law if they were in the business of acting as insurance agents.

[4] *E. C. Gatlin*, 34 B.T.A. 50 (1936). But compare *Commissioner* v. *First Security Bank of Utah*, 405 U.S. 394 (1972). In the *First Security* case, the Court held that there could not be a shifting or distorting of the true net income (the sine qua non of respondent's power under sec. 482 to reallocate income) in which the bank would be in violation of a law were it to receive income, whereas no violation of law existed so long as no income was received (by the bank) for its conduct. Justice Powell distinguished assignment of income cases by saying "But the assignment of income doctrine assumes that the income would have been received by the taxpayer had he not arranged for it to be paid to another." The easy distinction between *First Security* and the present case is that *First Security* involved sec. 482 whereas this case does not. More importantly, *First Security* seems inapposite under the theory of either petitioner or respondent since the Court in *First Security* stated that "The Banks received no commissions or *other income* on or *with respect to* the credit insurance generated by them." (Emphasis added.) Under petitioner's view of the facts, the commissions were received directly by the corporations (petitioner being a conduit) and under the respondent's view, the corporations were acting as petitioner's agents. In either case, the corporations were receiving income of one sort or another with respect to the insurance sales.

[5] In *Campbell County State Bank, Inc.*, 37 T.C. 430, 439 fn. 5 (1961), a case very similar to the one here at issue, South Dakota law prohibited a bank from engaging in any business activity other than banking. There this Court held the State statute relevant "only to show the existence of some business purpose (other than the saving of Federal income taxes) for conducting the insurance business through an entity other than Bank."

It is equally true that notwithstanding contrary provisions in the written contracts between petitioner and Lloyds and the Keystone agency, it is possible for Federal tax purposes for petitioner to transfer to his corporations the capacity to earn the commissions provided for in the contracts. See *American Savings Bank*, 56 T.C. 828 (1971); *Nat Harrison Associates, Inc., supra*.

Respondent's third line of attack is that the income should be attributed to petitioner as a matter of law since the checks were made to his order. Respondent relies heavily upon *Blassie* v. *Commissioner, supra*, for the proposition that petitioner's control over the proceeds should cause petitioner to be considered the one who "earned" the commission. We have carefully considered *Blassie* and find it distinguishable from the facts of this case since in *Blassie* the taxpayer's intent and action was to *donate* the commission income to a trust fund having no part in the production of the income.[6]

In essence respondent has argued that notwithstanding the corporate viability, the relationship between petitioner and Shaw Ford and American was that petitioner carried on the insurance enterprise and assigned the proceeds to the respective corporations. Petitioner asserts that Shaw Ford and American had control of the insurance enterprise itself rather than control merely over the proceeds. Since the latter view dignifies the relationship to the degree necessary under section 61 to shift the incident of tax to Shaw Ford, *American Savings Bank, supra*, we must look past the question of who received the proceeds or to whom the license was issued to the question of who was in control of the enterprise or the capacity to produce the income.

In answering the question of who earned income, it is our task to consider what was actually done, rather than simply the declared purpose of the participants (to the extent the Lloyds and Keystone contracts are seen as a declaration by petitioner that he would enter the insurance business as an individual); when applying the income tax laws, regard must be had to matters of substance and not mere form. This preference for substance over form in tax matters extends

---

[6] Petitioner's right to the commission receipts was not entirely without restriction in view of Texas law prohibiting diversion of the opportunity of a corporation to make a profit and uncompensated use of corporate facilities by corporate officers and directors. In such a case, the corporation has a claim on the entire personal profit, rather than simply compensation for damages. *International Bankers Life Ins. Co.* v. *Holloway*, 368 S.W. 2d 567, 577 (Tex. 1963). See also *Palmer* v. *Stokely*, 255 F. Supp. 674 (W.D. Okla. 1966). Balanced against the general proscription of the diversion of a corporate opportunity to make a profit are the legal prohibition of corporate insurance agents and the fact that petitioner was virtually the only shareholder and thus would have had a private but not a secret profit at the expense of the corporation had he retained the commissions. We decline to become involved in these intricacies of Texas law because first, we believe the important question not to be who had apparent control over the proceeds, but rather who had control over the source of the income, and second, even if we were to find the corporations to have no claim on the proceeds enforceable in a State court, we believe respondent's stipulation that petitioner "always treated such corporations as being entitled to the income" to b the substantial equivalent of a claim enforceable under State law in the context of this issue.

to claims of petitioner and respondent alike. *J. Leonard Schmitz,* 51 T.C. 306, 317 (1968).

In both *American Savings Bank, supra,* and *Nat Harrison Associates, Inc., supra,* there was independent evidence that the business and contract performance rights were transferred to the corporations claimed by the respective petitioners to have actually earned the income. In this case, there is no clear evidence that the insurance business was transferred to the corporations by petitioner subsequent to his obtaining of the license and contractual status, nor is there clear evidence that he was acting as an agent of American at the time the Lloyds contract was entered into and the license obtained. (Shaw Ford was not even in existence at that time.) Furthermore, good reason existed for not constituting the corporations as the principals in the insurance business, since petitioner felt to do so would be illegal under State law.

The evidence tending to show that the corporations were in fact the principals in the enterprise of selling insurance is ambiguous. Cited by petitioner in this respect are the facts that petitioner consistently treated the proceeds as belonging to the corporations, that the costs of the sale of insurance were buried in the corporations' general accounting systems without separate identification, that the sale of auto insurance played an important role in the sale of autos by Shaw Ford, and that Shaw Ford employees believed themselves to be working for the corporation rather than petitioner.

These facts lend equal weight however to the proposition that petitioner was himself in the insurance business (admittedly to benefit his corporations) and used the corporations as his agents in the carrying out of the business of selling insurance. See *Moke Epstein, Inc.,* 29 T.C. 1005 (1958). Compare *Raymond Pearson Motor Co.* v. *Commissioner,* 246 F.2d 509 (C.A. 5, 1957), reversing a Memorandum Opinion of this Court. Petitioner's endorsement of the commission checks over to the corporations may thus be seen as being in the manner of compensation for services. See *Clinton Davidson,* 43 B. T.A. 576 (1941). In the *Pearson* case the Commissioner attempted to attribute income received in the name of a partnership to a corporation which ostensibly did all the work necessary to earn it. The Court held that the undertaking of an obligation (to purchase repossessed autos) by the partnership was a contributing factor in the production of the income, and therefore the partnership was not a sham. In the instant case, petitioner was directly involved in the insurance enterprise in at least one respect since the efforts of the corporations, regardless of their substance, would not diminish the personal liability of petitioner to the insurance companies under the agency contracts for premiums collected from customers; nor would such cor-

porate efforts diminish petitioner's personal liabilities to the purchasers of insurance policies bearing his name as agent of record. See *Houston-American Life Insurance Co. v. Tate*, 358 S.W. 2d 645 (Tex. Civ. App. 1962), in which the court pierced the veil of a corporation selling insurance to get at the assets of the parent company.

Considering the whole record, and for the reasons enumerated above, we find that petitioner and not the corporations earned the commission income here in question, which is taxable to him as gross income.

Petitioner's alternative argument is that his endorsement of the checks to the corporations amounted to compensation for services rendered by them and reimbursement for expenses incurred by them, each being deductible under section 162. Similar claims have arisen in *Clinton Davidson, supra,* and *Edwin J. McEnaney,* 3 T.C. 552 (1944). In the *Davidson* case the individual taxpayer, a licensed insurance agent, set up a corporation to carry on estate-planning services acting through agents and employees other than Davidson. The corporation seldom charged the customer a fee, making it known that the resulting insurance commissions would be fee enough. During certain of the years in question, all commissions received by Davidson were turned over to his corporation. The Board stated at page 586 that:

We consider that the assignment to the corporation of the entire amount of the original commissions was not reasonable compensation to it for any contribution which it made to the earning of those commissions. As the originator and proprietor of a business writing upward of $4,000,000 of insurance annually, it is inconceivable that petitioner would have made such an arrangement at arm's length with a stranger.* * *

Although petitioner was not directly involved with customers, it is reasonable to assume that he had overall supervisory responsibilities in addition to his occasional assumption of the role of "closer." Furthermore, as noted above, petitioner had certain statutory liabilities to his insurance customers and contractual liabilities to the insurance companies which could not be avoided by merely delegating the duties of performance to the corporations. We therefore believe a portion of the payments by petitioner to American and Shaw Ford to be nondeductible under section 162, that portion being equal to a reasonable compensation for his role in the insurance enterprise, less the amount of compensation otherwise received from those companies. *Edwin J. McEnaney, supra* at 560; compare *Clinton Davidson, supra.*

As to the proper amount which should be treated as compensation to petitioner for his role in producing the insurance income (and as a consequence a denial of the deduction claimed under section

162 for payments made to the companies to the extent such amount exceeds the compensation paid by the companies to petitioner) we must apply *Cohan* v. *Commissioner*, 39 F.2d 540 (C.A. 2, 1930), since clear evidence of such an amount is unavailable. Considering the whole record, we believe that amount to be 25 percent of the income derived by American and Shaw Ford from the insurance enterprise after deducting their insurance-related direct and indirect expenses.

With regard to Shaw Ford, that company incurred both direct and indirect expenses in the sale of insurance; the direct expenses were the salesmen's commissions on the sales of policies, and the indirect expenses were a portion of the remaining operating expenses of the business except for donations, interest, depreciation, taxes, etc.

Based upon amounts put into evidence by petitioner and unquestioned by respondent, Shaw Ford's insurance-related expenses totaled $32,640 and $39,068 for 1964 and 1965, respectively.[7] As a consequence, the nondeductible portion of petitioner's payments to Shaw Ford equals 25 percent of $6,598 and $20,529 for 1964 and 1965, respectively (those amounts being the net income from the insurance activities of Shaw Ford), since petitioner admitted at the time of trial that he had drawn no salary from Shaw Ford.

The problem with respect to American is somewhat different. Petitioner has stipulated that:

Prior to the petitioner acquiring control of * * * [Shaw Ford] Dub Shaw owned certain corporations which engaged in the automobile and automobile loan business, and the income from all insurance business connected with the sale of automobiles by said corporations was reported by said corporations. Petitioner * * * has always treated the sale of such insurance consistently in all of his car businesses and has always treated such corporations as being entitled to the income from such insurance business. * * *

From this we may conclude enough similarity existed between American (the auto loan business referred to above) and Shaw Ford so that our determination that petitioner's reasonable compensation should be 25 percent of the net profit from insurance is equally applicable to both companies. However, we are not informed by the record as to the amount of American's direct or indirect expenses applicable to the insurance business; more importantly we are likewise uninformed as to the amount of compensation which petitioner might have drawn from American during the years in question.[8] (Although the joint

---

[7] Those amounts are the sum of direct salesmen's commissions resulting from the sale of policies and a proration of overhead expenses as set forth in our Findings of Fact, the proration being based on the ratio between insurance gross profits and total gross profits, 7.28 percent and 8.88 percent for 1964 and 1965, respectively.

[8] The amount of salary or other compensation withdrawn from American by petitioner would reduce the portion of petitioner's payment to American which is otherwise not deductible. *Edwin J. McEnaney*, 3 T.C. 552, 560 (1944).

returns of petitioner and his spouse show salary income of $18,174 and $15,205 for 1964 and 1965, there is no indication of whose salary it was or by whom it was paid.)

Respondent has raised the issue as to petitioner's liability with respect to the commission checks deposited by petitioner to the account of American by way of a post-trial motion to conform his answer to the proofs; consequently we may not make the unsupported *assumption* that American had no insurance-related expenses or that petitioner drew no salary from American. Although American "ceased active operation" sometime during February of 1964, it was not liquidated until December 1966. The fact that active operations (the auto loan business) ceased after February 1964, does not necessarily indicate that there were no insurance-related expenses prior to or following mid-February; nor does the ceasing of the auto loan business necessarily indicate that no salary was paid to petitioner during 1964 and 1965. Since respondent has the burden of proof as to American's insurance-related expenses and as to the nonexistence of compensation from American to petitioner during the years in question, and since the record is barren as to both of these points, we therefore hold that the entire amount paid by petitioner to American during the years in question is deductible under section 162.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

SIMPSON, J., concurring: Although I agree with the result reached by the majority, I do not agree with the reasons set forth for adopting such result. Rather, I generally agree with the approach taken by Judge Tannenwald of taxing income to the taxpayer who did the work which generated the income. See *American Savings Bank*, 56 T.C. 828 (1971); *Nat Harrison Associates, Inc.*, 42 T.C. 601 (1964). However, I would find that by taking certain risks, the petitioner did some of the work which generated the income and is taxable under section 61 on the portion of the commission income which he so earned. See *Nat Harrison Associates, Inc., supra* at 620; cf. *Commissioner v. Sunnen*, 333 U.S. 591 (1948); *Helvering v. Eubank*, 311 U.S. 122 (1940); *Griffiths v. Commissioner*, 308 U.S. 355 (1939); *Lucas v. Earl*, 281 U.S. 111 (1930). Similarly, the corporation would be taxable on the portion of the income generated by the selling activities of its agents. *Nat Harrison Associates, Inc., supra* at 620. Even though the Second Circuit has held that section 482 must be used to allocate income between related taxpayers (*Rubin v. Commissioner*, 429 F. 2d 650 (C.A. 2, 1970), reversing and remanding 51 T.C. 251 (1968)), this Court has not committed itself to the view that section 61 is inapplicable if section 482 might be applied (*Richard Rubin*, 56 T.C. 1155,

1161 (1971); *Local Finance Corp.*, 48 T.C. 773 (1967), affd. 407 F. 2d 629 (C.A. 7, 1969), certiorari denied 396 U.S. 956 (1969); cf. *Philipp Bros. Chemicals, Inc. (Md.)*, 52 T.C. 240 (1969), affd. 435 F. 2d 53 (C.A. 2, 1970); *Grenada Industries, Inc.*, 17 T.C. 231 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953), certiorari denied 346 U.S. 819 (1953)). In this case, I would apply section 61 so as to tax 25 percent of the income to the petitioner and 75 percent to the corporation.

DAWSON, J., agrees with this concurring opinion.

----

STERRETT, *J.*, concurring: I agree with the majority that the income at issue belongs and is taxable to the petitioners. With respect to the allocation issue I concur in the result, but would have reached that result by making a finding as to the value of the services rendered by Shaw Ford and American, allowing the value so found as an offsetting deduction against the premium income.

RAUM, SCOTT, and HALL, *JJ.*, agree with this concurring opinion.

----

TANNENWALD, *J.*, dissenting: I cannot escape the feeling that, despite their protestations to the contrary, the majority has permitted the assumed illegality of the conduct of the insurance business by Shaw Ford and American to influence its decision herein. As a consequence, *Commissioner* v. *First Security Bank of Utah*, 405 U.S. 394 (1972), seems to have had an intimidating effect in a different factual situation involving a different legal issue. In that case, the Supreme Court rejected an attempt by respondent to utilize *section 482* in order to tax income *to* a person who had not actually received the money and who was prohibited by law from engaging in the type of business which earned the income. In this case, the question is whether *section 61* can be applied so as to move the incidence of taxation *from* a person who actually received the money and who appears to have performed the bulk of the services for which the money was paid, but who was prohibited by law from engaging in such services. Thus, we have the *reverse* of the factual situation which existed in *First Security Bank*, as well as the question of the applicability of another section of the Internal Revenue Code. Indeed, the Supreme Court itself recognized that it might deal differently with a case such as this. See *Commissioner* v. *First Security Bank of Utah, supra* at 401 fn. 11.

There is really no dispute as to the underlying facts herein so that the inhibitions that operate against disagreement by one who was not the trier of the facts are not present. The majority recites and does not dispute the "facts that petitioner consistently treated the proceeds as belonging to the corporations, that the costs of the sale of insurance were buried in the corporations' general accounting systems

without separate identification, that the sale of auto insurance played an important role in the sale of autos by Shaw Ford, and that Shaw Ford employees believed themselves to be working for the corporation rather than petitioner." It then merely dismisses these facts as "ambiguous." Having recognized that the illegality of corporate operation of the insurance business was not, in and of itself, sufficient to justify the taxability of the income to petitioner, rather than the corporations, the majority appears to hang its hat on the facts that the petitioner was involved in the corporate enterprises and that he continued to have the ultimate personal liability to the insurance companies.

I disagree with the majority analysis. It is clear that American and Shaw Ford in fact carried on the insurance activities. Their employees sold the insurance and shared in the commissions and handled all the claims. The corporations paid all the expenses; the customers' premium checks were received and forwarded by the corporations to the insurance companies, the commission checks were deposited directly in the corporate bank accounts, and the right to the commissions as to Shaw Ford's share of the business was used as collateral for that corporation's bank loans. Petitioner's participation was peripheral in his capacity as a corporate supervisory official. His personal liability, although direct in a technical legal sense, was in substance that of a guarantor of performance by the corporations.

There is no dispute that American and Shaw Ford were separate viable entities and entitled to be treated as such. *Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943). Additionally, the majority holds—and correctly so—that the corporations should not be viewed as *donees* of the commissions. Cf. *Blassie* v. *Commissioner*, 394 F. 2d 628 (C.A. 8, 1968), affirming a Memorandum Opinion of this Court; *Kimbrell* v. *Commissioner*, 371 F. 2d 897 (C.A. 5, 1967), affirming a Memorandum Opinion of this Court.

In my opinion, the substance of the instant situation is that American and Shaw Ford performed all the services connected with the insurance and received the commissions in connection therewith. As a consequence, they, and not petitioner, should be taxable on the income represented by those commissions. The fact that the corporations may have been prohibited by law from engaging in the insurance business does not prevent this conclusion. See *James* v. *United States*, 366 U.S. 213, 219 (1961). Nor is the fact that the technical legal right to the commission income may have been vested in petitioner in and of itself sufficient to impose taxability on him. I disagree with *Blassie* v. *Commissioner*, *supra*, to the extent that it stands for the proposition that such a legal right is determinative. Moreover, in that case this Court found the stipulation of the parties significant

and the burden of proof was on the respondent. *Moke Epstein, Inc.,* 29 T.C. 1005 (1958), is also distinguishable on its facts.

Respondent has raised no issue as to the allocation to petitioner, under section 482, of a portion of the income of the corporation in light of the fact that, at least as to Shaw Ford,[1] he received no salary from the corporation, and we express no opinion with respect thereto. Cf. *Rubin* v. *Commissioner,* 429 F. 2d 650 (C.A. 2, 1970), reversing and remanding 51 T.C. 251 (1968), on remand 56 T.C. 1155 (1971), affirmed per curiam 460 F. 2d 1216 (C.A. 2, 1972).

QUEALY, *J.,* agrees with this dissent.

---

[1] The record does not reveal whether petitioner received any salary from American during the taxable years in question.