NATIONAL UNDERWRITERS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nat'l Underwriters v. Comm'r
Docket No. 4554-71. United States Tax Court
T.C. Memo 1974-14; 1974 Tax Ct. Memo LEXIS 303; 33 T.C.M. (CCH) 49; T.C.M. (RIA) 74014; January 23, 1974, Filed. Harold N. Roney, for the petitioner.
John B. Harper, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION
SCOTT, Judge: Respondent determined deficiencies in petitioner's income taxes for its taxable years ended December 31, 1966 and December 31, 1967 in the *304 amounts of $12,767.49 and $10,914.07, respectively. The issue for decision is whether payments made to petitioner's four officer-shareholders in 1966 and 1967 in excess of $16,000 and $16,032.90, respectively, were reasonable compensation for personal services actually rendered. 2 FINDINGS OF FACT
Some of the facts have been stipulated and are found accordingly.
Petitioner, National Underwriters, Inc., is a corporation organized in the State of Tennessee on November 27, 1964. Its principal office is at McMinnville, Tennessee, and was so at the time it filed its petition in this case. For its taxable year 1966, petitioner filed its Federal income tax return with the district director of internal revenue, Nashville, Tennessee. For its taxable year 1967, petitioner filed its Federal income tax return with the director of the internal revenue service center, Chamblee, Georgia.
During the years in issue, petitioner, through its various agents, sold insurance for two insurance carriers, Thomas Jefferson Insurance Company of Louisville, Kentucky (with principal offices in Nashville, Tennessee) and Dependable Insurance Company of Orlando, Florida. All Thomas Jefferson policies *305 sold by petitioner were in connection with loans made by American Loan of McMinnville, Inc. and its subsidiaries, and City Bank and Trust Co., a commercial bank located in McMinnville, Tennessee. 3 From the date of its organization through the close of the last taxable year in issue, petitioner's officers and shareholders were as follows: Officer
Percentage of
Stock Owned H. B. Roney, President
33-1/3%
J. R. English, Vice President
33-1/3%
Harold N. Roney, Treasurer
16-2/3%
Charles E. Roney, Secretary
16-2/3%
The officers also comprised petitioner's board of directors. H. B. Roney was chairman of the board. H. B. Roney is the father of Harold N. Roney and Charles E. Roney. J. R. English was not related to any of the other officers. H. B. Roney and J. R. English were licensed insurance agents; the other officers were not. Petitioner's bookkeeper during the years in issue was Elsie N. Roney, the wife of H. B. Roney and mother of Harold N. and Charles E. Roney.
During 1966 and 1967, petitioner's offices were located initially in Harold Roney's law offices and later in the studios of WHNR-FM, a radio station owned by Harold Roney and Charles *306 Roney as partners. Both offices were in McMinnville, Tennessee. Except for office supplies and a few items of office equipment, the office expenses of petitioner were borne by the law office or the radio station. 4 American Loan of McMinnville, Inc., (hereinafter referred to as American Loan) was a consumer finance company during the years here in issue. It was organized by H. B. Roney and incorporated on October 22, 1962, under the provisions of Tennessee law (Chap. 90, § 1 et seq., Public Acts 1929 (repealed 1968)). It operated under the provisions of Tenn. Code Ann. § 45-2001 et seq. (1964), as amended by Tenn. Code Ann. § 45-2001 et seq. (Cum. Supp. 1971) (relating to industrial loan and thrift companies). Its principal place of business was McMinnville, Tennessee. It had five wholly-owned subsidiaries located elsewhere in the State of Tennessee: American Loan of Knox County, Inc.; American Loan of Rutherford County, Inc.; American Loan of White County, Inc.; American Loan of Williamson County, Inc.; and American Loan of Franklin County, Inc.
American Loan, had, during 1966 and 1967, at least 10 shareholders, each of whom held an equal number of shares. The *307 shareholders of American Loan, were, with two exceptions, also members of the board of directors of City Bank and Trust Co. (hereinafter referred to as City Bank). J. R. English and Frank Howard, stockholders of American Loan, were not members of the board of directors of City Bank. The largest shareholder of City Bank, who held 8 to 10 percent of its stock, was a stockholder of American Loan. 5 During 1966 and 1967, H. B. Roney, petitioner's president, was president and a full-time employee of City Bank. On business days he worked at the bank from 7:30 a.m. to at least 4:00 p.m. and often to 5:00 or 6:00 p.m. H. B. Roney was also chairman of the board of American Loan and president of all of its subsidiaries. In his capacities as president of City Bank and president of American Loan, and its subsidiaries, H. B. Roney was responsible for the general supervision of the companies and for carrying out the policies of the boards of directors. During 1966 and 1967, City Bank had 41 or 42 employees; American Loan and its subsidiaries had a total of 23 or 24 employees.
Neither Harold N. Roney nor Charles E. Roney was an officer or director of either American Loan, its subsidiaries, *308 or of City Bank.
H. B. Roney first entered the insurance business in 1936 in Gallatin, Tennessee. In 1937 he became a partner in a general insurance agency in Gallatin. In 1945 he established a general insurance agency in Hendersonville, Tennessee. H. B. Roney's experience in banking began in 1944 when he became the cashier of a bank in Hendersonville. In 1959 Roney became employed as cashier of City Bank in McMinnville, Tennessee where 6 he subsequently became president. H. B. Roney and three other persons organized the Tennessee Loan Corporation in 1953. This company which they later sold in 1959 was a consumer financing company. In 1962 Roney organized American Loan and its subsidiaries.
During 1966 and 1967, J. R. English was vice president and treasurer of American Loan and vice president of all American Loan subsidiaries. In these capacities, he acted as the full-time general manager of American Loan and its subsidiaries.English came to work for American Loan when it was organized in 1962 at the age of about 28. He had previously worked in a supervisory capacity for Sun Finance Co. in Louisiana.
The clientele of American Loan and its subsidiaries generally consisted *309 of persons deemed to be poor credit risks. Typically, the borrower would own no assets other than a used car. His income usually did not exceed $3,500 per year and often he owed money to several other financial institutions.
During 1966 and 1967 the legal rate of interest for consumer finance companies in the State of Tennessee was a 6 percent per annum discount off the face amount of the note. In addition, the lender would charge a service fee equal to 4 percent of the face amount of the note. This 4 percent service fee would 7 also be levied against loan renewals in the full amount of the new loan. For example, on a loan of $100 for 30 days, initially the lender would withhold $.50 as interest and $4.00 as a service fee. If the borrower repaid $25 at the end of the 30 days, the loan would be renewed for $75 and the lender would withhold about $.40 as interest but also $3 as a service fee. Combining the "service fees" with the 6 percent legal interest, the annual percentage interest rates on consumer loans in Tennessee during 1966 and 1967 ranged from 15 to 150 percent per annum. American Loan and its subsidiaries obtained money to be used for consumer loans at an interest *310 rate of between 10 and 11-1/2 percent.
Under Tennessee law as it existed in 1966 and 1967 a customer of a loan company such as American Loan could be required to purchase "single interest" insurance as a condition of receiving the loan. See Tenn. Code Ann. § 45-2007(k) (1964), as amended, Tenn. Code Ann. § 45-2007(k) (Cum. Supp. 1971). Single interest insurance insures only the interest of the lender in the borrower's collateral. For example, if a loan company lends $100 to a borrower and the borrower puts up his used car as collateral, if the collateral is damaged or destroyed, the single interest insurance will compensate the lender if the loan is not repaid. The borrower receives no proceeds from the insurer. 8 Single interest insurance is generally sold under a "retrocontract", that is the seller is paid a fixed commission, with an additional commission paid retroactively if there are no losses. Losses are paid out of the "retrocommissions." The carrier receives 10 to 15 percent of the premiums with the remainder being paid to the seller in commissions (less any losses). Virtually all the single interest insurance sold by finance companies is sold directly by the *311 companies rather than through independent or outside agencies.
Petitioner sold single interest automobile policies for used cars serving as collateral for loans made by American Loan and its subsidiaries and by City Bank. These policies were issued by the Thomas Jefferson Insurance Company. Petitioner also sold a banker's comprehensive installment policy written for City Bank by Dependable Insurance Co. of Orlando, Florida, protecting City Bank from losses resulting from a failure to record mortgages and financing statements and policies carried by the Thomas Jefferson Insurance Company covering household goods financed by American Loan. Very few policies covering household goods were sold by petitioner. Petitioner did not hold itself out to the public as an insurance agency or broker. It did solicit business at 4 or 5 banks, but none was ever secured. 9 Under Tennessee law, only natural persons may be licensed insurance agents or brokers. See Tenn. Code Ann. §§ 56-801(f), 56-902 et seq., 56-1001 (1964). The single interest automobile policies (and the few household goods policies) were sold under a credit property insurance agreement between Thomas Jefferson Insurance *312 Company and H. B. Roney. In its pertinent parts, this agreement provided as follows:
The Company hereby grants authority to the Agent, to solicit on the Company's behalf, Property insurance, in an amount not to exceed $2,500.00 on any one risk, covering property mortgaged with
National Underwriters, Inc., P.O. Box 590, McMinnville, Tennessee
and/or affiliated and associated companies, on the following terms and conditions:
1. The Agent shall have the authority to solicit Property Insurance within the aforesaid limitation on behalf of the Company and to countersign and deliver policies in the form prepared by the Company and signed by the President of the Company and entrusted to the Agent, to debtors upon receipt from such debtors of the premium stipulated in the schedule of rates from time to time in effect and furnished by the Company to the Agent. The Agent shall have no authority to countersign or deliver any such policy, except in accordance with the terms and conditions of this Agreement, and the terms and conditions of said policies, so prepared and entrusted to the Agent by the Company. The Agent shall have no authority to solicit or collect premiums on any insurance, *313 other than that provided for in policy forms furnished by the Company to the 10 Agent or countersign or deliver any other form of policy or certificate of insurance for the Company, other than such forms as may from time to time be furnished by the Company to the Agent, and shall have no authority to change, alter, amend, vary or waive any of the terms or conditions contained in such policies, but may fill in the blank spaces on such forms in accordance with the regulations of the Company. 2. (a) The Company will pay the Agent and the Agent agrees to accept as full compensation for his services of every kind hereunder the following compensation.
ON PROPERTY INSURANCE:
A Commission of 25% on Net premiums collected by the Agent and paid over to the Company.
* * *
ADDITIONAL COMPENSATION FOR POLICYWRITING, POLICYHOLDERS" SERVICE, COLLECTION AND REMITTANCE OF PREMIUMS
* * *
From 90% of the cumulative earned premiums there shall be deducted (1) the cumulative total losses and loss expenses paid and (2) all the Company's reserve on all claims outstanding including incurred but unreported claims and (3) all commissions paid by the Company to the Agent cumulative and (4) the cumulative *314 total of all amounts previously paid to the Agent. If the remainder be a plus figure the Company shall pay to the Agent the amount of such remainder to compensate the Agent for policywriting, policyholders' service, collection and remittance of premiums, claims expense and any other special allowances which the Company might otherwise be required to make to the Agent. 11 Should the remainder be a minus figure the minus figure shall be carried over to subsequent accountings against any amounts that otherwise become payable to the Agent under the aforesaid formula. (Emphasis supplied)
* * *
THOMAS JEFFERSON INSURANCE COMPANY
By Allen Eskind
"Company"
National Underwriters, Inc.
By H. B. Roney
"Agent"
Policies handled by petitioner were sold by loan officers of American Loan and its subsidiaries and by loan officers of City Bank. Sometimes the policies were sold by the assistant managers of the American Loan offices or various bank employees on behalf of the usual salesmen. There was one loan officer-salesman in the City Bank, H. B. Roney, and one in each of the six offices of American Loan. All loan officers selling insurance were licensed by the State of Tennessee *315 to underwrite insurance and in particular to sell Thomas Jefferson Insurance Company policies. See Tenn. Code Ann. § 56-701 (1964). Petitioner considered the loan officers to be independent contractors rather than employees or sub-agents of petitioner.
The single interest automobile policies sold by petitioner covered losses arising from fire, theft, and 12 collision. Either one of the American Loan companies or the City Bank would be the named insured of each single interest policy sold by petitioner. The policy periods of the single interest policies coincided with the periods of the loans. The policy sold by petitioner contained the following pertinent provisions:
IN CONSIDERATION of the payment of the premiums and subject to the limits of liability, exclusions and conditions and other terms of this policy, the Company agrees to pay for direct and accidental loss and damage to the property, sustained during the policy period, with respect to such and so many of the following coverages as are indicated above by the inserted policy charge or charges.
The Company agrees to insure the interest only of the Named Insured, or assignees of the Insured, in the property described *316 in the policy, while the property is in the lawful possession of the debtor, under a bailment lease, conditional sale, mortgage or other encumbrance.
(1) COVERAGES: - SINGLE INTEREST
(a) Automobile.
Loss or damage, hereinafter called loss, caused by fire or theft of the automobile. Loss or damage, hereinafter called loss, caused by collision of the automobile with another object or by upset of the automobile.
* * *
(3) CONDITIONS PRECEDENT TO LIABILITY:
The Named Insured agrees, and it is a condition precedent to the attaching of the Company's liability for any loss under Coverage (1) (a) * * * 13 (a) That, at the date this policy is effective, there are no payments more than (30) thirty days past due under any bailment, bailment lease, conditional sale, mortgage or other encumbrance, covering the insured property; also, (b) That the Purchaser or Borrower has defaulted in payments; and that the Named Insured has made all reasonable efforts to collect overdue payments and, failing to do so, has repossessed the damaged property.
(c) No loss shall be deemed to have occurred under this policy unless the amount of damage, resulting from one collision, fire or theft loss, exceeds *317 the Named Insured's interest, as represented by the debtor's unpaid balance, on the damaged property repossessed, and not more than sixty (60) days past due, less the salvage, interest, finance, and other carrying charges computed pro rata as of the date of loss.
* * *
(8) CANCELLATION PROVISIONS:
a. Applicable in the State of Tennessee, and
(1) Applying to Dual Interest Coverage. If the Insured or Company cancels this insurance, earned premiums shall be computed pro rata.
(2) Applying to Single Interest Coverage. If the Insured or Company cancels this insurance, earned premiums shall be computed in accordance with the Rule of 78, i.e. the Insured shall receive the Unearned Premium on a pro rata basis, calculated in even months, which shall be equal to the proportion of the total premium as the sum of the monthly time balances under the original contract.
* * * 14 (9) LIMITS OF LIABILITY:
The Company's liability for loss of or damage to any property insured hereunder shall not exceed the limits specified in such policy nor exceed the lowest of the following limits:
(a) The actual cash value of the property insured at the time of loss, less net salvage value, or
(b) The *318 amount of any impairment, resulting from one collision, fire, or theft loss, of the Named Insured's interest as represented by the Purchaser's or Borrower's unpaid balance on note, not more than sixty days past due, less net salvage value, less interest, Insurance, finance and other carrying charges computed pro rata as of the date of the loss.
(10) OTHER INSURANCE:
This Company shall not be liable for loss if at the time of loss there is any other valid and collectible insurance which would attach if this insurance had not been effected, except that this insurance shall apply only as excess and in no event as contributing insurance, and then only after all such other insurance has been exhausted.
* * *
The policy also contained this provision:
THIS POLICY DOES NOT PROVIDE BODILY INJURY AND PROPERTY DAMAGE LIABILITY INSURANCE OR ANY OTHER COVERAGE FOR WHICH A SPECIFIC PREMIUM IS NOT MADE AND DOES NOT COMPLY WITH ANY FINANCIAL RESPONSIBILITY LAW.
IN REGARD TO AUTO COVERAGE * * * , WE DIRECT YOUR ATTENTION TO THE FACT THAT COVERAGE UNDER THIS POLICY PROTECTS THE INTEREST OF THE LIENHOLDER ONLY AND DOES NOT PROTECT THE INTEREST OR EQUITY OF THE PURCHASER OR BORROWER * * *. 15
*319 Both the American Loan companies and the City Bank required that loan customers carry collision insurance of their own on the automobiles serving as loan collateral. They further required that losses under the owner's collision policy be payable to American Loan or to City Bank. Insurance companies selling ordinary automobile physical damage insurance in Tennessee generally do not sell collision insurance alone, but require that fire and theft coverage also be purchased.
Premiums for single interest automobile insurance are based solely upon the unpaid balance of the loan for which the automobile is collateral. The premiums do not relate to the type of automobile or other risk factors. The following is a schedule of rates charged by Thomas Jefferson Insurance Company for its single interest automobile policies during the years here in issue: Unpaid
3 Months
6 Months
9 Months
12 Months
13 Months
Balance
Applying to
Auto And
Limit of
Liability
$ 0 - $ 150
$ 3.75
7.50
$11.25
$15.00
$16.25
1151 - 300
5.38
10.75
16.13
21.50
23.29
301 - 500
6.50
13.00
19.50
26.00
28.17
501 - 700
7.38
14.75
22.13
29.50
31.96
701 - 1000
8.25
16.50
24.75
33.00
35.75
1000 or
.88 per $100
1.75 per
2.64 per
3.50 per
3.79 per
Over
$100
$100
$100
$100
*320 Unpaid
15 Months
18 Months
21 Months
24 Months Balance
Applying to
Auto And
Limit of
Liability
$ 0 - $ 150
$18.75
$22.50
$26.25
$30.00
1151 - 300
26.88
32.25
37.63
43.00
301 - 500
32.50
39.00
45.50
52.00
501 - 700
36.88
44.25
51.63
59.00
701 - 1000
41.25
49.50
57.75
66.00
1000 or
4.38 per $100
5.25 per $100
6.14 per $100
7.00 per $100
Over 17 Applications for single interest automobile insurance of the type sold by petitioner were contained in a five-part application-policy. The five parts were the agent's, creditor's, home-office and cancellation copies of the application, and the policy itself. The application-policy contained carbon papers so that when the application for insurance was filled in, a copy was made on the policy itself. Applicants for the insurance received copies of the policy at the time the loan was made and the application for insurance was executed. In the case of loans made by the American Loan companies, the loan itself was closed at the same time as the single interest insurance policy was written.
The home office and the agent's copies of the application would be forwarded to petitioner *321 by the loan officers on a daily basis. Accompanying these copies would be checks for the premiums paid. If a prior policy were being cancelled and a refund or credit (usually a credit) were being made, a cancellation form would also be forwarded with the other documents. These documents would be received in petitioner's office by its bookkeeper, Elsie Roney, who would review them for errors. If there were none, she would record information from the documents in a ledger. One ledger was kept for each salesman. The ledgers showed the name of the borrower 19 Sixty-five percent of the gross premiums paid for the policies sold were retained by petitioner and thirty-five percent were forwarded to the Thomas Jefferson Insurance Company. If Thomas Jefferson had not been required to pay any claims on its policies during the month, an additional 25 percent of the gross premiums submitted would be returned to petitioner. If claims were paid, they were deducted from the 25 percent of gross permiums ordinarily returned to petitioner. In any event, the Thomas Jefferson Insurance Company received 10 percent of the gross premiums on policies sold by petitioner through the various loan *322 officers. From its own account, petitioner paid the loan officer-salesmen monthly 5 percent of the premiums which they had generated for that month. If there were no claims on policies sold by a loan officer-salesman, he received an amount equal to 7/24ths of 5/12ths of the 90 percent commission earned by petitioner on policies sold each month in addition to the 5 percent commission.
During the first year of petitioner's operation, the Thomas Jefferson Insurance Company required petitioner to build up a reserve of $1,200 to pay claims under its policies. The reserve was accumulated from the 25 percent of gross premiums usually returned to petitioner. Once 20 the required reserve was established, the full 25 percent was returned to petitioner. The reserve was discontinued in 1966.
The following schedule shows a summary of the premiums collected by petitioner with respect to Thomas Jefferson Insurance Company policies sold, the 65 percent commissions and the 25 percent "retrocommissions" paid, and the losses paid on Thomas Jefferson policies for the period January 1966 through June 1968: 21 Period
Premiums
Commissions
Retrocommissions
Losses Paid 1966 January
$ 2,035.04
$ 1,322.78
$ 488.41
February
2,552.67
1,659.24
612.64
March
4,087.64
2,656.97
981.03
Ap ril
4,510.68
2,931.94
1,082.57
May
6,126.78
3,982.41
1,470.43
June
7,050.55
4,582.86
1,762.63
July
7,055.24
4 ,585.99
1,763.73
August
6,020.99
3,913.64
1,505.26
September
6,656.38
4,326.66
1,664.09
October
5,692.65
3,700.23
1,423.16
November
8,144.82
5,294.13
2,036.21
December
7,513.63
4,883.86
1,878.42
[1] 67,447.07
[1] 43,840.71
[1] 16,668.58
1967
January
4,621.96
3,004.27
1,155.50
February
4,147.36
2,695.78
1,036.84
March
5,687.65
3,6 96.97
1,421.92
April
5,599.28
3,639.54
1,399.80
May
3,856.98
2,507.03
964.26
June
4,911.15
3,192.25
1,227.79
July
4,949.90
3,217.44
1,144.47
August
6,712.84
4,363.34
1,678.22
September
5,703.81
3,707.48
1,425.95
$ 93.00
October
5,459.20
3,548.47
1,364.81
November
6,686.01
4,345.91
1,671.50
December
5,842.08
3,797.35
1,460.53
[1] 131,625.29
[1] 85,556.54
[1] 32,620.17
[1] 93.00
1968
January
4,516.24
2,935.55
1,129.07
February
4,280.98
2,782.64
1,070.25
March
5,147.30
3,345. 75
1,286.83
81.00
April
3,654.69
2,375.55
832.66
May
1,191.69
774.60
297.94
June
1,629.77
476.78
990.01
[1] 152,045.96
[1] 98,247.41
[1] 38,226.93
[1] 174.00
*323 22 Each month during 1966 and 1967 the Thomas Jefferson Insurance Company prepared a contingent commission report which was sent to petitioner for each month of its operations. These reports were used by petitioner in computing the monthly commissions of the loan officer-salesmen. With the report would be sent a check for the portion of the 25 percent commissions, or part thereof, payable to petitioner.
During 1966, petitioner processed 2,551 Thomas Jefferson policies and in 1967 processed 1,945 such policies. All but approximately 250 of the policies sold each year related to consumer loans made by the American Loan companies. In 1966, petitioner processed 713 partial refunds of premiums relating to loans on which payment was made prior to the loan maturity dates and in 1967 petitioner processed 945 of such refunds. In most instances, the refunds were credits made against the premiums on new policies. In 1966 petitioner's treasurer, Harold Roney, drew 333 checks on petitioner's bank account and in 1967 he drew 314 checks.
In addition to single interest automobile insurance, the Thomas Jefferson Insurance Company also sold household goods insurance *324 in connection with consumer financing. Thomas Jefferson Insurance Company had an agency contract for the sales of this type of insurance 23 not with National Underwriters but with American Loan. J. R. English signed the agency agreement on behalf of American Loan as "Vice President-Agent." The agreement was virtually identical to the "credit property" insurance agreement executed by H. B. Roney for petitioner. The maximum commission payable to the agent was 89 percent of the premium.
In addition to the Thomas Jefferson Insurance Company policies, the loan officers of the American Loan companies sold credit life insurance.
Petitioner was also agent for sale of banker's comprehensive installment loan policies. These policies were carried by the Dependable Insurance Company of Orlando, Florida and petitioner sold these for City Bank loans. The premium rate was $3.50 per secured installment note. The premium was payable monthly.
On May 28, 1969, the State of Tennessee issued an order by which maximum rates for single interest automobile insurance were set at 3 percent per annum, to be applied to the lesser of the loan balance at the inception of the loan or the actual cash *325 value of the collateral being insured. The minimum premium which had previously been $10 was set by May 28, 1969 order at $1.00. 24 Following a decline in its business in 1968 and 1969, the assets of petitioner were sold in 1969 to Crestline Finance Corporation.
H. B. Roney as petitioner's president supervised generally petitioner's activities to the extent supervision was required. It was his function to contact the insurance carriers when necessary. He would plan corporate matters with the appropriate officers, review policy applications, form late underwriting policy, hire personnel, promote and sell policies.
Routine record keeping, bookkeeping, filing and secretarial work was done for petitioner by Elsie Roney. Her compensation was $600 per year.
J. R. English, as vice president of petitioner, was responsible for directing the work of the loan officer-salesmen, promotion of business, devising promotion contests, motivating salesmen, visiting with salesmen and training them, reviewing applications for policies, and serving as a director of petitioner.
Harold N. Roney, as treasurer, was in charge of all financial records and money of petitioner and supervised the record *326 keeping process and executed all corporate checks. He prepared all corporate tax returns except for the year 1968. He prepared petitioner's payroll. As petitioner's general counsel, Harold N. Roney organized petitioner and prepared the minutes of 25 the directors' meetings. Harold N. Roney also reviewed all claims for losses submitted by American Loan or the City Bank of which there were very few. Altogether, Harold N. Roney devoted about 125 hours per year during 1966 and 1967 to legal problems of petitioner and 325 hours per year to administrative problems. During this period Harold N. Roney charged his private law clients at the rate of $25 per hour. Harold N. Roney did not sell insurance for petitioner.
Charles E. Roney, as secretary of petitioner, was in charge of all corporate records, files and papers and corporate minutes. He would review the work of the petitioner's bookkeeper and the loan officer-salesmen. He managed petitioner's office. He also assisted in the resolution of problems with refunds and credit. Charles Roney was 23 years old in 1966 and devoted most of his time to the operation of radio station WHNR-FM. Charles Roney's duties with petitioner *327 consumed about 9 hours per week.
It is a common practice among small banks to permit their top executives to earn insurance commissions from outside sources during banking hours.
For 1965, 1966 and 1967 petitioner's officers were paid monthly. Their monthly compensation was 26 determined by petitioner's board of directors at the close of each month. Although the minutes of petitioner's board meetings indicate that the amounts paid to J. R. English and H. B. Roney were commissions for insurance sales, the payments were not based on a fixed percentage of sales nor on any agreement as to the amounts to be paid. The amounts paid were determined by the board after petitioner's operating results for the month were known.
For the period January 1, 1965 through March 31, 1967, H.B. Roney and J. R. English (each one-third shareholders) received the same amounts each month for the 27-month period. Similarly, Harold N. Roney and Charles E. Roney (each one-sixth shareholders) received the same amounts each month for that period. During this 27-month period, each one-third shareholder received one-third of the total compensation to officers and each one-sixth shareholder received one-sixth *328 of the total compensation to officers. From April 1, 1967, through December 31, 1967, each one-third shareholder received equal monthly payments. Total compensation paid to each one-third shareholder for the nine-month period was more than one-third of the total compensation to officers for that period, and total compensation paid to each one-sixth shareholder was less than one-sixth of the total compensation paid to officers. 27 Petitioner has paid no dividends since incorporation, although funds had been available for distribution to stockholders through the year 1969.
For its taxable years ended September 30, 1966, and September 30, 1967, American Loan and its subsidiaries reported on consolidated returns the following: Taxable Year Ended Sept. 30
1966
1967 Gross receipts
$341,390.64
$351,797.61
Officers'
compensation:
H. B. Roney
$7,661.06
$3,400.00
(President)
J. R. English
3,198.32
7,900.00
(Treasurer)
10,859.38
11,300.00
Salaries and Wages
80,063.49
76,406.19
Bad debts
67,769.45
53,362.40
Interest paid
68,776.64
78,405.01
Supervision
36,137.19
41,635.90
Taxable income before
10,908.89
26,454.07
net operating loss
deduction
Taxable income
(3,583.46)
22,870.61
*329 Petitioner's Federal income tax returns for its taxable years 1965, 1966 and 1967 show the following: 1965 Gross receipts (less returns and allowances)
$32,276.41
Less: Cost of goods sold
15,545.20
Gross profit
$16,731.21
Deductions:
Compensation of officers
$15,308.51
Salaries and wages
550.00
Depreciation
28.18
Total deductions
$15,886.69
Taxable income
$ 884.52
1966
Gross receipts (less returns and allowances)
$101,291.72
Less: Cost of goods sold
Insurance premiums
$33,711.90
Commissions
9,158.71
Postage
17.33
Office supplies
136.64
Bank charges
5.70
43,030.28$0
Gross profit
$ 58,261.44
Deductions:
Compensation of officers
$ 54,376.55
Salaries and wages
600.00
Depreciation
28.18
Total deductions
$ 55,004.73
Taxable income
$ 3,256.71
1967
Gross receipts (less returns and allowances)
$ 83,939.00
Less: Cost of goods sold
Insurance premiums
$17,984.00
Commissions
12,497.00
Postage
46.00
Supplies
27.00
30,544.00
Gross profit
$ 53,385.00
Interest
16.00
$ 53,401.00
Deductions:
Compensation of officers
$ 51,769.00
Salaries and wages
600.00
Depreciation
28.00
Taxable income
$ 1,004.00
*330 29 On petitioner's 1965, 1966 and 1967 Federal income tax returns, it claimed deductions for the following amounts of compensation for the officers: 1965
1966
1967 H. B. Roney
$5,102.85
$18,125.54
$22,867.87
J. R. English
5,102.85
18,125.58
22,867.87
Harold N. Roney
2,551.41
9,062.72
3,016.45
Charles E. Roney
2,551.40
9,062.71
3,016.45
In addition to the compensation received from petitioner, H.B. Roney received the following amounts of compensation during 1966 and 1967: Employer
Type
1966
1967 City Bank
Director's Fee
$ 330.00
380.00
City Bank
Salary
10,940.00
12,040.00
American Loan of
Salary
2,979.19
3,400.00
McMinnville, Inc.
American Loan of
Director's Fee
600.00
1,150.00
McMinnville, Inc.
Georgia International
Insurance Commissions
116.48
6,567.53
Life Insurance Co.
City Bank
Insurance Commissions
7,296.60
None
The insurance commissions received from Georgia International Life Insurance Co. were H. B. Roney's 1/7th share of the total commissions received from the sale of credit life insurance policies by the City Bank. During 1966 and 1967 the bank had seven officers. The *331 amounts of compensation identified as insurance commissions from City Bank were earned by Roney from the sale of various types of insurance such as life insurance, household goods insurance and homeowner's insurance. 30 Respondent determined that the amounts petitioner claimed as a deduction in its taxable years 1966 and 1967 as compensation for its officers was excessive. Respondent determined that the following amounts are reasonable compensation for the years in issue and any amount in excess is unreasonable and is not in fact compensation: Officer
1966
1967 H. B. Roney
$5,000.00
$5,000.00
J. R. English
5,000.00
5,000.00
Harold Roney
3,000.00
3,016.45
Charles Roney
3,000.00
3,016.45
OPINION
Section 162, I.R.C. 1954, provides that there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered. Respondent contends that the *332 salaries paid to petitioner's officers during 1966 and 1967 were excessive. Petitioner alleged in its petition only that the salaries were not excessive but on brief contends primarily that the "s_aries" paid to its officers constitute funds which were earned by these officers and not by National Underwriters, Inc.; 31 and that consequently petitioner never "earned" the income which it "paid" to its officers. [1]
In any service corporation, the amounts "earned" by the corporation are earnings from the services of its officers and employees. The assertion that its officers and not National Underwriters, Inc., "earned" the income which petitioner reported during 1966 and 1967 is no different than a comparable assertion by any corporation performing primarily a service function. However, it is a basic tenet of Federal tax law that a taxpayer must normally accept the tax consequences *333 of the way in which he deliberately chooses to cast his transactions. Sterno Sales Corporation v. United States, 345 F.2d 552, 554 (Ct. Cl. 1965). As stated by the Court of Appeals for the Sixth Circuit" * * * Courts are justified in treating transactions for tax purposes according to the plan adopted by the taxpayer rather than on the basis of some other plan that might have been adopted." Edmister v. Commissioner, 391 F.2d 584, 586 (C.A. 6, 1968) affirming per curiam 46 T.C. 651 (1966). 32 We are not impressed by petitioner's belated claim that it earned no income. Petitioner's reliance on Jerome J.Roubik, 53 T.C. 365 (1969) is misplaced. In that case the taxpayers contended that their professional services corporation earned the income and was entitled to deduct pension plan contributions. We held that the corporation did not earn any of the income generated by the taxpayers' services and that the taxpayers had to include in their income the pension plan contributions which would have been sheltered from immediate taxation had the corporation been recognized for Federal tax purposes as taxpayers contended. In Jerome *334 J. Roubik, supra, respondent was challenging the validity of the corporation. Here petitioner is not challenging the validity of its own existence nor would such a challenge be valid after it has filed income tax returns attesting to its existence and actively carried on business activities. Moline Properties v. Commissioner, 319 U.S. 436 (1943), Ernest H. Weigman, 47 T.C. 596; 604-605 (1967) affirmed 400 F.2d 584 (C.A. 9, 1968).
This Court recently held in R. W. Shaw III, 59 T.C. 375 (1972) that an individual who owned and controlled a corporate insurance agency was required to include in his gross income the proceeds received from the sales of insurance policies by the employees of 33 that agency but was permitted to deduct a portion of the proceeds which he paid over to the corporation as compensation for his insurance salesmen.
We stated in the Shaw case (59 T.C. at 383-384):
In answering the question of who earned income, it is our task to consider what was actually done, rather than simply the declared purpose of the participants * * *; when applying the income tax laws, regard must be had to matters *335 of substance and not mere form. * * *
In both American Savings Bank, supra and Nat Harrison Associates, Inc., supra, there was independent evidence that the business and contract performance rights were transferred to the corporations claimed by the respective petitioners to have actually earned the income. In this case, there is no clear evidence that the insurance business was transferred to the corporations by petitioner subsequent to his obtaining of the license and contractual status, nor is there clear evidence that he was acting as an agent of American at the time the Lloyds contract was entered into and the license obtained. * * * Furthermore, good reason existed for not constituting the corporations as the principals in the insurance business, since petitioner felt to do so would be illegal under State law.
Unlike the Shaw case, we find that the evidence in the instant case shows that H. B. Roney contracted with the Thomas Jefferson Insurance Co. as agent for petitioner. The record shows that the understanding of H. B. Roney as president of petitioner, and of the officials of Thomas Jefferson Insurance Company was that the latter's property insurance policies, both single *336 interest automobile and household goods, would be sold by a corporation, National Underwriters, Inc. 34 The agreement dated November 23, 1964 in which Thomas Jefferson Insurance Company authorizes its property insurance policies to be sold is signed on behalf of National Underwriters, Inc. by H. B. Roney, "agent." Thus we find that the evidence shows that National Underwriters, Inc. earned the income which it reported on its Federal income tax returns for the years in issue. [2]
Petitioner is, of course, entitled to deduct from its gross profit reasonable allowances for its officers' compensation. The reasonableness of officers' salaries is a factual issue to be determined from all the evidence of record. The services rendered by each officer of petitioner must be judged separately in determining the reasonableness of his compensation. L. Schepp Co., 25 B.T.A. 419, 429-430 (1932).
During the years in *337 issue, the State of Tennessee limited the legal interest which could be charged by a small-loan company to 6 percent per annum. However, the loan companies had to pay between 10 percent and 12 percent interest on the money they borrowed to lend out. To recoup this difference and to earn a profit, 35 the loan companies in Tennessee such as American Loan, resorted to such guises as "service charges" and to the sale of single interest insurance. The effect of these devices was to raise the interest rate on small loans up to as much as 150 percent interest per annum.
One of petitioner's witnesses, the president of the Crestline Finance Company spelled out the purpose of single interest automobile insurance as follows: A potential borrower wishes to purchase a used car for $100. The automobile is in rather poor condition.The lender, a small-loan company, will insist that the automobile, which will serve as collateral for the loan, be insured against loss from collision, fire and theft. The borrower realizes that normal collision and comprehensive insurance might well cost more than the automobile itself. Accordingly, the borrower might well consider the purchase of single interest *338 insurance which, if the loan were for a 3-month period, would cost only $3.50 (putting aside consideration of the minimum premium of $10 which was in effect in Tennessee until 1968).
Single interest automobile insurance as sold by petitioner and as sold by almost all agents is on a "retrocontract" basis. All risk of loss is borne by the insurance agent and none by the carrier. Because of the relatively low rates for single interest insurance 36 and because rates are based solely on the balance of the loan and time of the loan and not on the normal factors which affect automobile collision and comprehensive insurance such as the driver's accident record and the characteristics of the vehicles being insured, the seller of single interest insurance must exercise care in selling these policies in order to make a profit, or the seller can resort to other methods to reduce its risk. Petitioner chose the device of requiring those buyers of single interest insurance to also be covered by ordinary automobile collision insurance. Furthermore, the record shows that generally insurance carriers will not write collision insurance alone but require the purchaser to also obtain automobile *339 comprehensive damage insurance.
Under petitioner's method of operation, if the automobile of a borrower from one of the American Loan companies was totally destroyed, the borrower's collision and comprehensive insurance carrier ordinarily would reimburse American Loan to the extent of its interest in the automobile (the amount of the loan still unpaid) under the loss payable clause in the collision and comprehensive damage insurance policy. Only if the borrower refused to make further payments on his loan and there was not sufficient collision and comprehensive insurance to reimburse American Loan would the single interest insurance accrue to the benefit of American Loan. 37 The record shows that petitioner paid two claims during the period January 1966 through June 1968. H. B. Roney testified that one claim which petitioner paid resulted from an accident which occurred when the borrower was driving from the American Loan office to his home where he was going to arrange the purchase collision insurance. As a result of this event, petitioner thereafter required that the borrower obtain collision insurance coverage by telephone before leaving the American Loan office.
During *340 1966 and 1967, this plan of double coverage netted petitioner a total of $118,176.71 in commissions whereas it paid out $93.00 for, it appears, one meritorious claim.
In determining whether the record shows that the salaries paid to the individual officers of petitioner were reasonable, these facts together with the evidence showing the hours worked by the officers, their expertise in the insurance business and all other evidence of record must be considered.
Respondent especially attacks the salary paid to H. B. Roney, the president of petitioner.
H. B. Roney described his principal function with petitioner as "underwriting," that is selecting those risks which petitioner would bear.As we have just noted, however, petitioner's requirement of double-insurance 38 coverage made this "underwriting" function virtually meaningless. H. B. Roney testified that he reviewed the applications for insurance and based on his investigations petitioner would reject those applicants that presented too great a risk. Respondent points out that this function would be minimal because of the nature of the insurance policy itself. At the time the borrower would apply for a loan at American Loan, *341 an application for single interest insurance would be completed. The application has three duplicate copies with carbon paper interleavings and the policy itself consists of a fourth duplicate copy of the application at the head of a page plus a recitation of the limitations of coverage at the bottom and rear of the page. This policy is given to the borrower upon approval of the loan.The American Loan office would file away two copies of the application and two copies of the application would be forwarded to petitioner's office, to be examined by H. B. Roney.Harold Roney's testimony clearly shows that if the application were completed correctly, the application would be filed after pertinent information was entered into ledgers by Elsie Roney.
There is little other evidence to show the nature of H.B. Roney's duties with petitioner. Taking into consideration his managerial responsibilities for 39 petitioner and the value of his contacts with the Thomas Jefferson Insurance Company but counterbalancing these with the fact that he was the full-time president of City Bank and president of the American Loan companies, we find that a reasonable compensation for H. B. Roney in 1966 *342 was $8,000 and for 1967, $8,000.
The record shows that J. R. English exercised close supervision over the loan officers at the various American Loan offices. The record shows that it was his responsibility to insure that the loan officers sold the single interest insurance and that the borrowers were covered by collision and comprehensive insurance in addition to the single interest coverage. J. R. English had extensive responsibilities with the American Loan companies and devoted a considerable portion of his time to those responsibilities. The fact that he may have been underpaid by the American Loan companies, if such is the fact, does not, however, justify petitioner for Federal income tax purposes in deducting as a business expense more than a reasonable compensation for his services performed for petitioner. However, the record does show that English was the officer directly responsible for training the loan officers at American Loan in how to sell insurance for petitioners and suprevising their work for petitioner.The clear indication from the record is that he spent more time 40 on work for petitioner than any of the other officers. His experience prior to coming with *343 petitioner had been in a supervisory capacity with small loan companies. In our view, reasonable compensation for J. R. English is somewhat greater than for any of the other officers of petitioner. Considering all of the evidence of record we conclude that reasonable compensation for English's services for petitioner for 1966 is $9,000 and for 1967 is $9,000.
Harold Roney and Charles Roney each provided similar services for petitioner. Neither wrote insurance but performed administrative duties in petitioner's main office. There is little or no evidence to explain why these officers of petitioner were paid over $9,000 each in 1966 and only slightly more than $3,000 each in 1967. Our examination of the record shows no evidence of any changes in their duties with respect to petitioner nor any more or less time devoted to their work for petitioner vis a vis their own primary occupations, a law practice for Harold Roney and the management of a radio station for Charles Roney.
Harold Roney acted as treasurer and general counsel of petitioner during 1966 and 1967. The record shows that his responsibilities as treasurer were routine and he was greatly assisted by the careful records *344 prepared 41 by his mother, Elsie Roney, the petitioner's bookkeeper. As general counsel, Harold Roney was required to examine claims made by American Loan or the City Bank for payment under the single interest policies. Because of the requirement that borrowers from these two lending institutions have automobile collision and comprehensive damage insurance, there were very few claims made against petitioner which Harold Roney would be required to examine. The majority of the claims arising from damage to loan collateral would be examined by Harold Roney in his role of general counsel to the American Loan companies. Only if it were discovered that the borrower had no collision and comprehensive insurance would Harold Roney be called upon to examine the loss in his role as an officer of petitioner. Harold Roney testified that in 1966 he did only about 125 hours of legal work for petitioner and that at that time he charged other clients $25 an hour for his legal services. These legal services performed by Harold Roney were in addition to certain administrative services he performed for petitioner. Considering the fact that Harold Roney's legal services for petitioner based *345 on his hourly charge to other clients would come to a little over $3,000 and that his administrative services had some value to petitioner, we conclude that reasonable compensation for his services to petitioner in 1966 was $5,000. 42 Charles Roney did not testify at the trial but from the testimony of his brother and father we are reasonably able to understand the nature of his position with petitioner. As secretary of petitioner he was responsible for the corporate records, for management of petitioner's office and for checking applications for refunds and credits. This latter task required an understanding of use of the "Rule of 78," a formula used by lenders to compute refunds on prepaid loans.
Considering Charles Roney's age, training, responsibilities to petitioner, and the demands put upon him by the operation of a radio station, we sustain respondent's determination that reasonable compensation from petitioner to Charles Roney for the year 1966 is $3,000.
Decision will be entered under Rule 155. Footnotes
1. Cumulative totals. ↩
1. Petitioner's argument in this respect to the extent it relies on the "officers selling the insurance" is difficult to follow for the record shows that two of the officers were not licensed insurance salesmen.↩
2. H. B. Roney testified as to the seller of the policies as follows:
"It would be a Thomas Jefferson policy but it would be purchased from National Underwriters."↩