**In the Matter of Gary Vance LEWELLYN, Debtor.**

**In Matter of G.V. LEWELLYN & CO., INC., Debtor.**

**Bankruptcy Nos. 82–766–C, 82–220–B.**

United States Bankruptcy Court, S.D. Iowa.

Oct. 29, 1982.

L.E. Slade, trustee of the estate of Lewellyn, pro se and by John G. Black and David H. Goldman of Black, Reimer & Goldman, Des Moines, Iowa.

Paul R. Tyler, trustee of the estate of G.V. Lewellyn & Co., Inc., pro se and by Richard A. Malm and James M. Peters of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, Iowa.

## MEMORANDUM OF DECISION

RICHARD STAGEMAN, Bankruptcy Judge.

The matters before the court are two motions. A motion by the trustee of the estate of Gary Vance Lewellyn ("Lewellyn") filed August 6, 1982, asking the court to order a joint administration of the bankrupt estates of Gary V. Lewellyn and G.V. Lewellyn & Company, Inc., and a motion by the trustee of the estate of G.V. Lewellyn & Co., Inc. ("G.V.L., Inc.") asking the court to order the consolidation of the same two bankrupt estates. A hearing was held on the two motions simultaneously on September 2, 1982. The two trustees each resisted the other's motion.

NOW, upon the evidence, arguments and briefs of counsel, the court makes the following:

## FINDINGS OF FACT

1. On April 15, 1982, the Honorable Harold D. Vietor, Judge of the United States District Court for the Southern District of Iowa, entered an order granting the application of the Securities Investor Protection Corporation ("SIPC") for the issuance of a Protective Decree adjudicating that customers of G.V.L., Inc. were in need of the protection afforded by the Securities Investor Protection Act of 1970 ("SIPA").

2. Paul R. Tyler was appointed trustee of G.V.L., Inc.

3. The case was therewith removed to this court.

4. Lewellyn filed a voluntary petition pursuant to the provisions of Chapter 11 of Title 11 of the United States Code on May 24, 1982.

5. On August 6, 1982, the Chapter 11 case of Lewellyn was ordered to proceed pursuant to Chapter 7 of Title 11 of the United States Code. Llewellyn E. Slade was appointed trustee of Lewellyn's bankrupt estate.

6. Lewellyn became a registered representative in the securities business in June of 1973. He was employed by the brokerage firm of Dain, Kolman & Quail until October, 1977. From 1977 to December 1980, he was vice president and branch office manager for E.F. Hutton in Des Moines, Iowa.

7. In December of 1980, Lewellyn left E.F. Hutton and incorporated G.V.L., Inc. G.V.L., Inc. was an Iowa corporation engaged in the securities investment business. It was registered with the Securities Exchange Commission, the National Association of Securities Dealers and the Securities Division of the State of Iowa.

8. G.V.L., Inc. marketed investment programs to the public denominated the Lewellyn Special Fund, Lewellyn Liquid Asset Trust, and the Six Month Trust ("Funds").

9. Lewellyn was the sole shareholder and sole operating officer of G.V.L., Inc. The business operated until March 31, 1982, and was officially closed by court order on April 12, 1982.

10. During this time Lewellyn also did business under the name of G.V.L. Company for the purpose of wiring funds. A name G.V.L./Solomon was used in the transfer of securities.

11. On January 4, 1982, Lewellyn was registered as a general partner and commodity pool operator with the Commodities Future Trading Commission employing the title Lewco 1981–I Ltd., a commodity partnership. It ceased doing business at the same time G.V.L., Inc. did.

12. Lewellyn also used the name Lewellyn Commodity Co. to receive commissions and as a bookkeeping entry to differentiate the business expenses of the commodity transactions from the expenses of the other business entities.

13. On April 8, 1982, Tyler entered the business offices of the debtors and took possession of the records found there. They were the general business records of a broker-dealer securities business, in this case, conducted by G.V.L., Inc. There were ledgers, checkbooks and customer files.

Tyler believes that some records relating to investments by individuals in the Funds are in the possession of Lewellyn's counsel. The records are incomplete.

14. Tyler has no way of knowing whether "lists" he found were lists of solely customers, solely creditors or prospective customers. The names listed were "in the hundreds." Tyler has received most of the claims he expects to receive. Two types of claims have been filed, customers of G.V.L., Inc. ("customer claims"), that is, those who dealt with G.V.L., Inc.'s security brokerage business, and general claims of creditors ("creditor claims"), that is, those who supplied the G.V.L., Inc. services or supplies.

15. Tyler has also obtained the records of various banks and brokerage businesses that dealt with G.V.L., Inc.

16. Tyler has also taken depositions of "various parties" who had information concerning these business affairs.

17. Some customers of G.V.L., Inc. did business on a "fully disclosed" basis through G.V.L., Inc. but directly with the brokerage firm Swiss American. Other customers invested in the Funds. Tyler cannot determine that the Funds ever existed, although customers have confirmation of purchases. There were also transactions in Government Bonds with at least two banks.

18. The money in Funds was placed in various accounts and used as Lewellyn saw fit, including personal investments in the name of Lewellyn.

19. Tyler has been unable to obtain records of some financial institutions, but based on those available he concludes that the accounts were used in an incomprehensible manner for transferring money back and forth making investments primarily in Lewellyn's name. These accounts were funded by customers of G.V.L., Inc.

20. Lewellyn did not make a distinction between his personal business dealings and the business dealings of G.V.L., Inc., and in general, disregarded the corporate entity of G.V.L., Inc.

21. The Securities Division of the State of Iowa restricted the brokerage activity of G.V.L., Inc., in that, it was to only act as a forwarding broker. Contrary to that restriction, whereunder G.V.L., Inc. was not to keep cash or securities of clients, G.V.L., Inc. did keep cash and securities of clients.

22. G.V.L./Solomon maintained a bank account with the United Central Bank in Des Moines, Iowa that had the same "Federal I.D." number as G.V.L., Inc.

23. Tyler believes that G.V.L., Inc. maintained what Tyler calls a "slush fund" for no clear purpose other than to make the books balance.

24. Bank records in the possession of Tyler show "over and over again" transactions were G.V.L., Inc. transferred funds to brokerage firms for accounts held in the name of Lewellyn.

25. From January 1981, to August 18, 1982, when thousands of dollars were coming into the Gary Lewellyn Special Fund from investors, G.V.L., Co., Lewco, and G.V.L., Inc., there were deposits from G.V.L., Inc. alone amounting to $275,000. During the same time checks were drawn on the Gary Lewellyn Special Fund each month to make $2899 mortgage payments on his home.

26. When G.V.L., Inc. commenced operations, its bookkeeping system consisted of a checkbook. Later a cash journal was added, still later, NASD insisted G.V.L., Inc. set up a general journal and ledger.

27. Money would come into G.V.L., Inc. and if the bookkeeper did not know the source, she would enter it under a "Due to Officers" account which was in effect an account for Lewellyn. This was at the behest of Peat, Marwick, Mitchell & Co., accountants.

28. In financial statements to regulatory authorities, Lewellyn was known to adjust

the statements and on one occasion deleted the " 'Due to Officers' account" which resulted in a reflected profit rather than a loss.

29.  One Bruce Holmgren, a field supervisor for the Federal Deposit Insurance Corporation (FDIC) examined the books and records of the First National Bank of Humboldt, Iowa.

He determined there were essentially three types of transactions in which "monies" were sent to G.V.L., Inc. or G.V.L./Solomon.  The first was a series of transactions where the First National Bank was purchasing government securities through G.V.L., Inc.  The second was a December 30th transaction where the First National Bank agreed to "strip" the next interest due on a block of government securities.  The last was an "apparent" loan of securities to G.V.L., Inc.

Holmgren testified that the bond coupon stripping arrangement transferred a "couple—$250,000, I think, par value maturing in early January to a safekeeping account of G.V.L./Solomon in the United Central Bank of Des Moines, Iowa.  The balance went to various accounts at the brokerage firm of 'Merrill Lynch' in New York."  No actual "bonds" that is, documents were transferred.  The procedure was to "wire book entry" securities from one entity to another through the Federal Reserve System.

"Monies" also went from the First National Bank into three accounts in the United Central Bank.  Those were G.V.L., Inc., G.V.L. Company, and G.V.L./Solomon.  Disbursements from G.V.L., Inc. went into the Gary Lewellyn Special Fund, a Lewellyn account at "Bankers Trust;" the Lewellyn account at "Statler;" Gary and Dena [his spouse] Lewellyn's personal account; a G.V.L., Inc. account at Credit Suisse, a bank in New York; a Lewellyn account at Clayton Brokerage; a Lewellyn account at Swiss American Securities; a G.V.L., Inc. account at Bankers Trust; a United Central Bank account in the name of G.V.L. Company; and to various customers to pay off loans at the United Central Bank, and for

other, "apparently, business and/or personal uses."

30.  The transfers of funds by Lewellyn back and forth between corporate, personal and other accounts were such that it is reasonable to find Lewellyn ignored the distinction between the three.

31.  In its dealings with the G.V.L., Inc., the First National Bank would receive a "confirmation of purchase" document showing the purchase of securities when in fact the records of G.V.L., Inc., reveal no such purchases.

32.  G.V.L., Inc. was initially under capitalized, in that it did not meet the minimum net capital requirements imposed by federal law.

33.  The records of G.V.L., Inc., and other related entities are such that the various transactions that took place cannot be reconstructed.  Some information is illegible and other information is missing.  Lewellyn did not keep the money of investors segregated from his own.

34.  From all of the uncontroverted testimony, the court finds it would be inordinately expensive and counter productive to have two trustees representing separate estates attempt to define the boundaries of their respective trusts.  The economic prejudice that might be visited on some creditors of either estate, if any, is outweighed by the economic prejudice all creditors would suffer by reason of the cost of the administering of two estates by adversary trustees.

## CONCLUSIONS OF LAW

1.  The court has jurisdiction over the subject matter of the two motions before it as well as the parties.

2.  There is a need for a substantial consolidation of the two estates.

3.  Paul R. Tyler, as a trustee appointed by a U.S. district court judge, and presently administering the estate of G.V.L., Inc., and G.V.L./Solomon, wherein the bulk of the assets of the two estates are rightfully reposed, as well as the bulk of the claims

against the corpus, is the most likely person to administer the consolidated trust estate.

## MEMORANDUM OF LAW

The trustee for the estate of Lewellyn asks the court to join the estates of Lewellyn and G.V.L., Inc., "administratively" or "procedurally." He seeks procedural efficiency to decrease the cost of professional and clerical work in the two cases by eliminating a duplication of effort. The procedure is akin to consolidation under Fed.R. Bankr.P. 742 which permits consolidation by applying Fed.R.Civ.P. 42(a) to adversary proceedings in bankruptcy cases. The purpose is to avoid unnecessary expense and delays in the administration of two parallel cases, but still preserve the separate estates of the entities involved.

The trustee of the estate of G.V.L., Inc. asks the court to consolidate the two cases substantively, save time and expense by merging the assets and liabilities of the two estates without regard for their separate entities, and create a single estate for the benefit of all creditors.

While the courts use the distinct terms "joint administration" and "consolidation," characterizing the first as procedural and the second as substantive, the differences between the two are more apparent than real. C. Seligson & C.F. Mandell, Multi-Debtor Petition: *Consolidation of Debtors and Due Process,* 73 Com.L.J. 341, 346 (1968).

> It is doubtful that there can be a consolidation of separate entities which affects only procedural rights. It would seem that every consolidation, however characterized, is likely to have an impact upon the substantive rights of at least some of the parties involved. If a true so-called procedural consolidation not adversely affecting any party in interest is possible, nothing really beneficial would be accomplished.

*Id.* at 347.

If a substantive consolidation [hereinafter "consolidation"] is appropriate for

these cases the issue of the necessity of a joint administration is moot. Consequently, the court will consider Trustee Tyler's motion first.

There are three primary areas to explore. Does the court have the power to consolidate estates; will the rights of creditors be protected; and may the existance of a corporate entity be disregarded.

There was no statutory authority under the Bankruptcy Act for a consolidation of cases, and there is none under the Bankruptcy Code.[1]

The only section in the Bankruptcy Code referring to the consolidation is 11 U.S.C. § 302(b). The Local Rules of this court are silent on the subject. The legislative history of the Bankruptcy Code treating § 302(b) requires the court to determine the extent, if any, to which the estates of the two debtors will be consolidated; that is, *assets and liabilities combined in a single pool to pay creditors.* Factors that will be relevant in the court's determination include the extent of jointly held property and the amount of jointly-owed debts. The section, of course, "is not license to consolidate in order to avoid other provisions of the title" to the detriment of either the debtors or their creditors. It is designed mainly for ease of administration. (Emphasis added). H.R.Rep. No. 595, 95th Cong., 1st Sess. (1977), U.S.Code Cong. & Admin.News 1978, p. 5787; S.Rep. No. 989, 95th Cong., 2d Sess. (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

The courts have relied on their general powers of equity to substantively consolidate bankruptcy estates. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *In re Continental Vending Machine Corporation,* 517 F.2d 997, 1000 (2nd Cir. 1975); *In re Flora Mir Candy Corporation,* 432 F.2d 1060 (2nd Cir.1970); *In re Cintra Realty Corp.,* 413 F.2d 302 (2nd Cir.1969); *Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d 845, 847 (2nd Cir.1966); *Soviero v. Franklin National Bank of Long*

---

1. Fed.R.Civ.P. 42(a) was not relied on under the Bankruptcy Act for a consolidation. Fed.R. Bankr.P. 117 and 742 are also of limited application.

*Island,* 328 F. 446 (2nd Cir.1964); *Stone v. Eacho,* 127 F.2d 284 (4th Cir.1942); *In re Snider Bros., Inc.,* 18 B.R. 230 (Bkrtcy.D. Mass.1982); *In re Richton Intern. Corp.,* 12 B.R. 555, 557 (Bkrtcy.S.D.N.Y.1981); *In re Vecco Const. Industries, Inc.,* 4 B.R. 407, 408 (Bkrtcy.E.D.Va.1980); *In re Commercial Envelope Manufacturing Co., Inc.,* 3 B.C.D. 647, 648–49 (Bkrtcy.S.D.N.Y.1977).

■ Because the consolidation affects substantive rights, *In re Flora Mir Candy Corporation, supra; In re Snider, supra; In re Food Fair, Inc.,* 10 B.R. 123, 124 (Bkrtcy. S.D.N.Y.1981), Collier on Bankruptcy ¶ 302.-05, 302–8 (15th ed.) and can treat some creditors unfairly, consolidation must be "used sparingly." *Chemical Bank v. Kheel, supra; In re Continental Vending Machine Corp., supra; In re Barnett,* 5 B.R. 525 (Bkrtcy.D.N.M.1980). The courts must carefully scrutinize the evidence before consolidating the estate even if there is no opposition. *Envelope Manufacturing Co., supra; In re Food Fair, Inc., supra; In re Richton Intern, Corp., supra.* This court has the power to consolidate these estates.

In *In re Snider Bros., Inc., supra,* the court stated:

It must be recognized and affirmatively stated that substantive consolidation, in almost all instances, threatens to prejudice the rights of creditors. See *In re Coventry Energy Corporation,* 5 B.C.D. 98 (S.D.Ohio 1979). This is so because separate debtors will almost always have different ratios of assets to liabilities. Thus, the creditors of a debtor whose asset-to-liability ratio is higher than that of its affiliated debtor must lose to the extent that the asset-to-liability ratio of the merged estates will be lower.

*Id.* at 234.

■ There is also a rule that a creditor who relies on the sole credit of one entity is entitled to have its claim satisfied out of that entity's assets even if the entity is no more than a corporate pocket of a parent entity. *Commerce Trust Co. v. Woodbury,* 77 F.2d 478 (8th Cir.1935), *cert. denied,* 296 U.S. 614, 56 S.Ct. 134, 80 L.Ed. 435 (1935). This rule should control consolidations un-less it is clear that the economic prejudice of continued debtor individuality substantially outweighs the economic prejudice of consolidation. See, *In re Snider, supra* at 235.

With regard to protecting creditor rights the proponents of a consolidation must first establish a need. The economic prejudice affecting specific creditors is most often outweighed by the anticipated cost or futility of straightening out inter-entity transactions. *Chemical Bank v. Kheel, supra,* recognized, consolidation was appropriate "where the inter-relationships of the group are hopelessly obscured and the time and expense necessary even to attempt to unscramble them so substantial as to threaten the realization of any assets for all creditors." *Supra* at 847. The extent to which the assets of separate entities are found to be hopelessly obscured must necessarily be decided on a case-by-case basis. See, *In re Vecco, supra* at 410.

The facts of the case before the court demonstrate clearly the need for a consolidation. There are inadequate records, an extensive commingling of funds, a hopeless transactional obscurity. All sides agree that a sorting out would be prohibitively expensive.

In addition to need the court must find that the consolidation will be fair to creditors. Judge Friendly, in concurring with the majority in *Chemical Bank v. Kheel, supra,* criticized the majority for failing to give more consideration to the claim of an objecting creditor that it had relied on the sole credit of only one entity. He states:

Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite, and the argument for equality has a specially hollow ring when made by the United States, whose priority over other creditors will necessarily be enhanced by having the assets of all those corporations thrown into hotchpot.

*Id.* at 848.

■ There is a presumption that creditors have not relied solely on the credit of

one of the entities involved. *Stone v. Eacho, supra.* In this case as in *Stone v. Eacho,* no claim of reliance has been offered. In *Chemical Bank v. Kheel, supra* at 847, notwithstanding Judge Friendly's admonition the court decided that even "absent a showing that it [a creditor] knowingly dealt with the group [more than one entity] as a unit and relied on the group for payment," the court had the power to consolidate. This is to say that once the proponent of consolidation makes out a *prima facie* case the burden shifts to the objector to show there was sole reliance on the credit of one entity. *In re Commercial Envelope Mfg. Co., Inc., supra* at 198; *In re Food Fair, Inc., supra* at 127.

■ In this case there has been no proof offered that any creditor relied on solely one or the other of the entities Tyler seeks to consolidate. Further, there is no evidence that a consolidation would tend to improve the financial position of any group of creditors as compared with another.

There is no lack of due process for the creditors of either estate, all received notice. SIPC appeared by counsel as did FDIC; University Bank and Trust; Swiss American Securities; and the firm of Drexel, Burnham, Lambert, Inc.

The FIDC filed a pleading in support of Tyler's motion to consolidate.

The fact that two or more entities, purportedly separate, are in fact not separate, is a weighty factor favoring the pooling of their assets and treating their creditors equally. With corporations this is metaphorically termed piercing the corporate veil.

Cases on the subject are legion and it would serve no purpose to detail them here. See, *e.g.,* Fletcher, *Corporations,* Vol. 2 (1975), § 43, at 209, *et seq.* In *Lakota Girl Scout Council, Inc. v. Harney Fund-Raising Management, Inc.,* 519 F.2d 634, 638 (8th Cir.1975) the court perceived six components that would give rise to a presumption that a corporation had no separate existence. They are (1) the corporation is undercapitalized, (2) without separate books, (3) its finances are not kept separate from individual finances, individual obligations are paid by the corporation, (4) the corporation is used to promote fraud or illegality, (5) corporate formalities are not followed, or (6) the corporation is merely a sham.

The rule also applies where a corporation is no more than the *alter ego* or instrumentality of an individual.

The Rules applicable to parent and subsidiary corporations apply with equal force to cases of a person holding all or most of the capital stock of a corporation. If it is his mere instrumentality, its separate corporate entity will be disregarded and he will be held personally liable. 2 R. Powell, *The Law of Real Property,* at p. 225[2][a], § 11 (Rev.Ed.1973). See, *Pepper v. Litton, supra; In re Citra Realty Corp., supra; Suhl v. Bumb,* 348 F.2d 869 (9th Cir.1965); *In re Foley,* 4 F.2d 152, 155 (S.D.Cal.1924); *Palmer v. Stokely,* 255 F.Supp. 674 (W.D.Okl.1966); *In re Gilespie Tire,* 54 F.Supp. 336 (W.D.S.C.1942); *In re Manzey Land & Cattle Co.,* 17 B.R. 332 (Bkrtcy.D.S.D.1982); *In re 1438 Meridian Place N.W., Inc.,* 15 B.R. 89 (Bkrtcy.D.C. 1981).

Piercing the corporate veil is a "drastic approach authorized only in the most extreme circumstances" *Karlin v. Avis,* 326 F.Supp. 1325, 1331 (E.D.N.Y.1971); *In re 1438 Meridian Place N.W., Inc., supra* at 96.

The burden of proof is on the party arguing that the entities involved are effectively one. 4 Collier on Bankruptcy, ¶ 70.15, pp. 138–139, n. 4 (14th ed.).

The evidence shows that Lewellyn totally disregarded the corporate fiction that G.V.L., Inc., was a separate entity. As the sole stockholder and manager he ignored corporate formality.

It further appears that large segments of his individual assets were acquired subsequent to his incorporation of G.V.L., Inc.

Any claim of separate entities here is without color of merit, and mere pretence. Only Lewellyn's counsel has suggested there are facts to the contrary. Lewellyn himself has repeatedly invoked the protec-

tion of the 5th Amendment of the Constitution against self incrimination. The court accepts the exercise of this fundamental right. Lewellyn's offer to be interviewed *in camera* in the court's judgment would not have been helpful or appropriate under the circumstances of these proceedings.

In any event, piercing the corporate veil may not even be vital to effect a consolidation. In *In re Glucken Company, Ltd.,* 457 F.Supp. 379 (S.D.N.Y.1978) the court did not find it necessary to apply the instrumentality rule. The court stated:

> While many of the considerations leading to a decision to consolidate may also lead to a conclusion that corporate identities should be disregarded, such a conclusion is not compelled. The standard for consolidation___that 'the interrelationships of the group are hopelessly obscured and the time and expense necessary even to attempt to unscramble them so substantial as to threaten the realization of any net assets for all the creditors, does not require any 'piercing of the corporate veil'. (citations omitted.)

at 384.

Based on the inability of the court and creditors to unravel the snarled skein of affairs of the entities involved the need for consolidation of their estates into one bankruptcy estate outweigh any incidental prejudice that might affect the creditors of either party.

This will result in a unique bankruptcy case in that it is not governed by the provisions of the Bankruptcy Code relating to Stockbroker Liquidation 11 U.S.C. § 742. This is Subchapter III of Chapter 7 of the Bankruptcy Code. Subchapter III is derived from Section 60(e) of the Bankruptcy Act and the SIPA. 15 U.S.C. § 78aaa *et seq.*

Both business and personal assets of a sole proprietorship have been administered in SIPA proceedings. *S.E.C. v. Wick,* 360 F.Supp. 312 (N.D.Ill.1973). A proceeding under SIPA originates in the United States District Court. 15 U.S.C. § 78eee(a)(3). SIPA also provides that the district court is given the jurisdiction, powers, and duties conferred upon a court of the United States having jurisdiction over cases under Title 11, except where such would be inconsistent with SIPA itself. 15 U.S.C. § 78eee(b)(2)(-A)(iii). This should satisfy the question of constitutionality presented by *Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). SIPA also requires the district court to appoint as trustee for the liquidation, as well as attorney for the trustee, such persons as SIPC, in its sole discretion specifies. 15 U.S.C. § 78eee(b)(3). Thereafter, SIPA mandates the removal of the entire liquidation proceeding to the bankruptcy court of the same judicial district. 15 U.S.C. § 78eee (b)(4).

The liquidation then proceeds as if it were being conducted under Chapters 1, 3, and 5, and subchapters I and II of Chapter 7 of Title 11 U.S.C., except where the Bankruptcy Code is inconsistent with SIPA. 15 U.S.C. § 78fff(b).

The trustee has certain duties which are separate from his duties under the Bankruptcy Code. These relate to a stockbroker's customers. 15 U.S.C. § 78fff(a)(1–4), (c). At the same time, the trustee is a trustee bound by the Bankruptcy Code to perform the duties of a trustee under the provisions of the Bankruptcy Code. 11 U.S.C. § 704; 15 U.S.C. § 78fff–1(b). See, *In re Oliveri,* 45 F.Supp. 32 (E.D.N.Y.1942). SIPA is no more than an "engraphment of insurance provisions" upon the pre-existing framework of former Section 60e of the Bankruptcy Act. *S.E.C. v. Aberdeen Securities Co., Inc.,* 480 F.2d 1121, 1123 (3rd Cir.), *cert. denied,* 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973). The proceeding looks not only to the claims of customers, but also the claims of general creditors. Harbeck, *Stockbroker Bankruptcy: The Role of the District Court and the Bankruptcy Court Under the Security Investor Protection Act,* Am.Bankr.L.J., Vol. 56, pp. 277, 279 (1982). This is to say that the trustee's impartiality applies to all creditors and his responsibility is to the entire bankruptcy estate and not to just stockbroker-

debtor customers. The trustee, Tyler, is not "SIPC's" trustee, he is the trustee of the debtor's bankruptcy estate. There is no reason that Trustee Tyler should not act as the trustee of the consolidated estates.